**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:  1:24-cv-24361-KMM

DARLENE WAMPOLE,

        Plaintiff,

vs.

CARNIVAL CORPORATION,

        Defendant.

_____/

REMOTE VIDEOTAPED DEPOSITION OF MONICA BORCEGUE

        DATE TAKEN:  Wednesday, June 11, 2025

        TIME:        10:37 a.m. - 12:01 p.m.

        PLACE:       Remotely via Videoconference

Examination of the witness taken before:

Maureen Uebelacker, RPR, FPR

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

APPEARANCES:

Counsel for Plaintiff:

    MATTHIAS M. HAYASHI, ESQUIRE
    ARONFELD TRIAL LAWYERS
    1 Alhambra Plaza - Penthouse
    Coral Gables, Florida 33134
    mhayashi@aronfeld.com

Counsel for Defendant:

    W. COOPER JARNAGIN, ESQUIRE
    GRAY ROBINSON, P.A.
    515 North Flagler Drive, Suite 650
    West Palm Beach, Florida 33401
    cooper.jarnagin@gray-robinson.com

ALSO PRESENT:

    Danny Holguin, Videographer

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 3

                        I N D E X

REMOTE VIDEOTAPED DEPOSITION OF MONICA BORCEGUE

DIRECT EXAMINATION BY MR. HAYASHI:                    4

                        E X H I B I T S

Plaintiff's Ex. No. 1  Notice                         5

Plaintiff's Ex. No. 2  Supplemental Answers           9

Plaintiff's Ex. No. 9  Photo                         13

Plaintiff's Ex. No. 10 Photo                         24

Plaintiff's Ex. No. 3  Photo                         30

Plaintiff's Ex. No. 4  Photo                         39

Plaintiff's Ex. No. 5  Disclosures                   43

Plaintiff's Ex. No. 6  Charts                        48

Plaintiff's Ex. No. 7  Investigative Report          50

(Exhibits retained by counsel)

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 4

PROCEEDINGS

THE VIDEOGRAPHER:  Good morning.  This is the beginning of Media 1 in the deposition of Monica Borcegue in the matter of Darlene Wampole versus Carnival Corporation, Case Number 1:24-cv-23461-KMM.  Today's date -- date, sorry, is June 11th, 2025 and the time is 10:37 a.m.  My name is Danny Holguin and I am the videographer.  The court reporter is Maureen Uebelacker.  We are here with Huseby Global Litigation.  Counsel, please introduce yourselves after which the court reporter will swear in the witness.  Thank you.

MR. HAYASHI:  Matt Hayashi for the Plaintiff, Darlene Wampole.

MR. JARNAGIN:  And Cooper Jarnagin on behalf of Defendant, Carnival Corporation.

Whereupon,

MONICA BORCEGUE, called as a witness by the Plaintiff, having been first duly sworn, testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. HAYASHI:

Q.   Okay.  All right.  I know your name, but can you just say your name for the record, ma'am.

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 5

A.   My name is Monica Borcegue.

Q.   Thank you.  And pleasure to see you again, Ms. Borcegue.

A.   Same here.

Q.   No change of position since your last deposition with us, right?

A.   No, I don't believe so.

Q.   All right.  And could you just tell the jury your position with Carnival for the record?

A.   Guest Claims Manager.

Q.   Okay.  And as Guest Claims Manager, today you are going to be offering testimony on behalf of Carnival Corporation, correct?

A.   Correct.

Q.   Okay.  And you got the notice of your deposition today, correct?

A.   Yes.

(Plaintiff's Exhibit No. 1 was marked for identification)

BY MR. HAYASHI:

Q.   Okay.  Let me cast this.  All right.  This is the notice of your deposition which I am going to mark as Plaintiff's Exhibit 1, correct?

A.   It is still pulling up.  There we go.  I just got it.  That's correct.

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Q.   Okay.   And on page three there is a section called Areas of Inquiry.  Do you see that?

A.   I do.

Q.    Okay.  Now I know your lawyer I think may have had some objections, but I'm -- subject to whatever objections your attorney may have had, you are prepared to discuss all of the areas of inquiry on this notice today?

A.   That is correct.

Q.   Okay.

MR. JARNAGIN:  Yeah, and Matt, let me add at the beginning, as far as areas numbers 21 and 22, we are going to see how detailed your questions get on those particular areas and make a call as to whether someone else needs to testify, but hopefully Ms. Borcegue has enough information gathered to respond to those to your liking.

BY MR. HAYASHI:

Q.   Okay.  That's what I was just going to ask.

Well, there is also something else.  We were expecting certain design documents, like portions of the build contract that may have addressed this, you know, whirlpool area, design specifications, furnishing inspection report, warranty file, you know, the usual request that we make.  Carnival -- I know they have

Page 7

been searching for it, but Carnival has not been able to locate these as of the time of this depo today.

A.   I can actually answer that for you.  We just got an e-mail right before the depo.  We don't have any of those items.  This was not an original area to the ship's build.  This area was actually added and dried out good in 2017, so there would be nothing, you know, in the contract.  There is no warranty file.  There is no furnishing report, nothing of any kind.

Q.   Okay.  Well, let me -- let's discuss that a little bit then.  Now, who did the installing?  Did you use a particular --

A.   I don't have any further -- sorry to interrupt.

Q.   Go ahead.

A.   I just don't want to curve this before we get, you know, deep into the questioning.  I don't have any detailed information.  We are still searching for dry dock documents, if anything exists.  The only confirmation I was able to get is that this is not an original area to the ship, but we are still pending any documents from the dry dock installation, anything that happened in 2017.  So as I sit here today, I can confirm that it is not an original area, but anything else would need to still come from, I guess now our

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 8

refurb department, and that is, you know, some separate research that will need to take place.

Q.   Okay.  Do we at least know whether Carnival used some third party, you know, company to assist in installing this or if they worked through a shipyard, or do we know how they went about this?

A.   I have no details as I sit here today. That's a separate research that now I need to do with a refurb department, since it is not an original area to the vessel.

Q.   Well, Mr. Jarnagin, I am not trying to be difficult, but I think we just found out that I think we are going to need another deponent.  I think when and how this was installed, whether there is another party -- yeah, like I think details of the installation are kind of what we have in mind.

MR. JARNAGIN:  So I understand your request. Like Ms. Borcegue said, we are going to be researching that now, and I believe you are entitled to know some of those details so we can make the appropriate arrangements following this deposition.

BY MR. HAYASHI:

Q.   Okay.  Thank you.  And I don't suppose you would -- you would happen to know who would have the

most knowledge about this, whether this would be Brett Vittles or somebody else.  Maybe it is not Brett Vittles because he is usually the ship design itself, right?

A.   I -- yeah, I would wouldn't know.  As I sit here today again, it is research that now needs to be done with a different department.

Q.   Okay.  Well, we will see whether it is him or somebody else.  We will be in touch.

(Plaintiff's Exhibit No. 2 was marked for identification.)

BY MR. HAYASHI:

Q.   Okay.  So let's go over what we can then.  I will mark this document as Plaintiff's Exhibit 2.  And do you recognize this document, Ms. Borcegue?

A.   I do.

Q.   Yeah.  So this is the second supplemental answers to Ms. Wampole's interrogatories served by Carnival and I believe this was -- this was yesterday.

A.   Correct.

Q.   Okay.  Thank you.  And yeah, and this -- this is a response to our request for a prior incident search, and could you just tell us how this search was performed?

A.   Well, this was a five year search for any

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 10

incidents involving a floor collapsing, a hole opening, any hatches such as the one in use on the conquest. It would only be the conquest class that has this configuration. No other vessel has this configuration of like a hatch and the teak wood for the whirlpool. That was confirmed. So once I had that confirmed, I went ahead and pulled data for five years for the conquest class and did the search. There were no other incidents other than the plaintiff's incident.

Q. All right. And it is your understanding -- is it your understanding that what happened in Ms. Wampole's incident, so we can understand that we are on the same page with her incident, so we understand -- you know, it might help us understand the search as well, but is it your understanding on behalf of Carnival that -- that there was some type of hatch, like a maintenance hatch that was -- that ended up like flipping when Ms. Wampole's foot made contact with it, or did some other type of mechanism occur is your understanding?

A. My understanding is that it was a maintenance hatch for the whirlpool that's adjacent to the area, and as she stepped on it, it collapsed under the weight of her -- of her foot. I am not really sure about any other details. We have an investigation report, if you

need me to refer to that if you have any specific questions, but that's my general understanding of what occurred.

Q. Yeah, maybe I should actually pivot to the investigation report to try to pin down our understanding of her incident.

I am not sure you need the incident report for this, but just generally speaking, is this maintenance hatch -- do we know if this maintenance hatch was supposed to be locked and it wasn't or did something else happen?

A. The maintenance hatch is -- does require some sort of access, so it does -- you can't just open and close it. Only a certain department -- I believe it is the engine department that has access to it, so it wouldn't be something that opens and closes. But it is my understanding that the wood actually, I guess, broke or came apart during this incident, so it is not a matter of the hatch being opened or closed, it is the actual, you know, build of it or makeup of it that -- that actually collapsed when she stepped on it. So I think that answers your question.

Q. Right. So as far as you know, there was no problem with the securing mechanism itself, it is just the wooden structure itself basically broke?

Page 12

A.    Correct, that's my understanding.

Q.    Okay.  The way this hatch would work is -- how would it work, maintenance people would come from the top, they would go underneath using it, or how would the purpose of this hatch be used?

A.    It would be accessed from the top.  It is kind of hard to explain.  I am not really sure how to put it in words.  It is a door on the deck that you would open and then you would have a space underneath that you would actually access if you needed to do any maintenance on the whirlpool.  So you would actually -- like to get into that -- into that area, you would have to access it through the hatch, I think.

Q.    Okay.  I think --

A.    I don't know if I am understanding your question.

Q.    Well, I think -- I think -- you know, you are answering to the best of your ability and I appreciate that, and I think we are moving this along.  So I guess what I am kind of getting at now then is if they are accessing this the way they are supposed to, the maintenance people, how would this hatch open, like would it -- I mean, I can show a picture maybe, if that helps.

A.    I mean, yeah, I think you can see it from the

picture that it is just a hatch would open, open and close. I am not really sure how to describe that.

(Plaintiff's Exhibit No. 9 was marked for identification)

BY MR. HAYASHI:

Q. Okay. Let me show a picture. I am going to show this out of order. This always happens, but I pre-mark these. This will be Exhibit No. 9. I don't think I have that many exhibits today, but I will show Plaintiff's Exhibit 9. Oh, I am still sharing the other screen. Give me a second. Have you signed this photograph before, Ms. Borcegue?

A. It is still loading. Okay. I believe I have. I have seen a few photographs that I believe your office produced to us, so this might have been one of them.

Q. Yes. So I will represent this is one of -- yeah.

A. Okay.

Q. One of her -- one of Ms. Wampole's photographs that she is produced. But does this fairly and accurately depict, you know, how the hatch looked in the immediate aftermath of Ms. Wampole's incident?

A. I am not exactly sure when this picture was taken, but yeah, I believe it was sometime after the

Page 14

incident.  I don't know how immediately after it was, but yeah, these are pictures from -- from the -- from the area.

Q.   Okay.  Now, how is -- so do you see how this -- this hatch is kind of tilting?

A.   Right.

Q.   So is it your understanding that what happened is that like basically this one piece, it -- it just fell through, like the right -- the right side, like looking at this picture from the right side from our vantage point it basically just -- it just sunk down and collapsed?

A.   That's correct.  So this is what I was trying to explain.  The hatch is supposed to open up, not into the hatch.

Q.   I see.  And to the left there seems to be some kind of hinge, right?

A.   I really can't see from how you have this picture.  I don't -- I am not able to tell.

Q.   Okay.  Well, I could be mistaken, but just the way the wood, the way the wood is designed, it just -- it kind of looks to me like the sides of the wood kind of protrude out a little bit.  It looks like there -- it is kind of supposed to be lodged in to the side of the structure, if that makes sense.

Page 15

A.   I don't -- I understand what you are saying but I am not sure that's the case.  I don't know.

Q.   Yeah.  Fair enough.  I mean -- yeah, I suppose.

A.   It looks like a frame that would have been over the area, not something that would be lodged into the sides.  That's what it looks like to me, however, I -- I don't know.  It kind of looks like the frame has been broken, so it -- to me it -- it looks like it is a frame that goes over the square hole.  Does that make sense?

Q.   Yeah, I think -- I think so.

A.   I believe there is photographs of it --

Q.   Yeah, yeah, I see.

A.   -- after the incident that would, you know, illustrate what I am trying to say.

Q.   Well, I actually -- I see the frame.  I think what is happening here is the right side of the frame is broken, and that's what is going on.  That's why it looks like it is protruding, basically.  Do you see there is like a -- part of the frame coming off on the right?

A.   Right.  That's what I am trying to explain.  It is like a frame that goes around the square.

Q.   Right.  Yeah.  Okay.  So -- okay.  I think

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

that makes sense.  Right.  And so basically the maintenance people, they would be flipping this up kind of like a manhole cover?

A.   Yeah, the hatch door itself, yes, that's correct.

Q.   Okay.  Well, do you know what type mechanisms, if any, are in place to prevent this from opening the wrong way, do you know, or that's kind of a design issue?

A.   No, I don't.  I am sorry to interrupt you. No, I don't know.

Q.   Okay.  I don't suppose you happen to know whether or not there was any type of support beams that are underneath this structure.  Like do you know if it is all supported just on the side walls, or do you know if there is any support beams underneath?

A.   I don't really know what is underneath.  I know that there has been an expert report in this matter that kind of explains how it is built.  I don't have any information outside of that as to exactly what is underneath the hatch.

Q.   Okay.  And as far as how these things are normally or properly supposed to be designed, I am guessing you don't really know that today, right?

A.   No.  Like I said, I really don't have any

DARLENE WAMPOLE vs CARNIVALCORPORATION
Monica Borcegue on 06/11/2025

Page 17

design information.  This was installed in 2017, so now that's new research that needs to be done.  This wasn't original to the vessel.

Q.   Okay.  What type of wood is this again, teak wood?

A.   Teak wood, correct.

Q.   Okay.  And that's not a synthetic type of wood, that's a real -- a real tree wood, right?

A.   Correct.

Q.   Okay.  Do you know if this -- if the wood, you know, the wood, the wood that composes this structure is the same wood that was installed in 2017, or do you know if -- if it was, you know, all or part of this was changed at any point from 2017 through the date of the incident?

A.   I don't believe it was changed, but again, that's something that I would need to now research with refurbishment.

Q.   Okay.  All right.  Well, if you got the accident report up, I can ask some questions about that.

A.   Sure.

MR. HAYASHI:  Okay.  So for the record, we've reached an agreement, me and your lawyer that you can read from it.  You can, you know, review it.

**DARLENE WAMPOLE vs CARNIVAL CORPORATION**
**Monica Borcegue on 06/11/2025**

Page 18

That in and of itself won't constitute a waiver of the privilege, but I feel obligated to say this, because of the misunderstanding that happened, we are also not saying that we are, you know, agreeing that all of this is necessarily privileged, but we are just agreeing that the review of it will not constitute a waiver.  So we are all on the same page, I guess, Mr. Jarnagin?

MR. JARNAGIN:  Yes.  I believe we are under agreement that by Ms. Borcegue reviewing the accident report to answer your questions, that you will not thereafter claim that her review is a waiver of the privilege.

MR. HAYASHI:  Right.  Yeah.  And we will see. I don't necessary anticipate going into requesting it, but, you know, we don't waive our right to seek it if we have some reason to challenge a privilege on some other reason other than her review, but yes -- okay.

BY MR. HAYASHI:

Q.  So I guess maybe to streamline this a little bit, you are familiar with Ms. Wampole's passenger statement and that's attached, right?

A.  Yes.  I have seen it, and I do have access to it now.

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Q.   Okay.  So I will just ask this -- maybe this is the simplest way to go about it.  There is no discrepancies as far as location, time, or, you know, who witnessed the accident, basic information like that between what is in the body of the accident report and what Ms. Wampole reports in her injury statement, just so we, you know, we know what we are dealing with.

A.   I don't believe so.  I am going through it. I don't think that there is anything different.

Q.   Okay.  And based on the accident report -- yeah, basically what you already described about the mechanism of how this incident happened, that's how it -- that's how the accident report understands it as well; is that correct?

A.   I mean, there is, for example, she -- she writes, she fell through floor, landed down two to three feet.  In the accident report there is actual measurements and it is only 52 centimeters, which is a foot and a little bit.  It is short of two feet.  So there is, you know, items like that that may be a little different as to what she is claiming in her passenger injury statement, but as far as who witnessed the accident, she lists her travel companions, other cruise goers that are later identified in the report, and the date and the time is -- is the same.  Who it

Page 20

was reported to is a pool slide staff member which is later on identified.  He is later on identified.  I don't see that there are many differences, if that's what you are asking.

Q.   Okay.  So was there any type of crew member that came -- that came and visited Ms. Wampole after her incident, after she had fallen into the -- into the hatch?  Did some crew member come by and maybe like offer her a drink or something or maybe offer some help?  But I am not sure if you have access to her deposition transcript, and I -- I don't at the moment, but I am just curious.

A.   I have reviewed it.  I believe it is a draft, but I've seen it.  I believe she did claim that somebody came by with drinks, but I don't have any information about that person.  The only information I have in the accident report would be who it was reported to, which was -- hang on.  It is loading.  I am sorry.

Q.   Okay.

A.   Okay.  There is an aquatic attendant that he was -- he was assigned in the area and a female guest called his attention, so that was her daughter, I believe, so at that point in time he notified his supervisor which would have been assistant manager of

Page 21

housekeeping, last name is Payer, P-A-Y-E-R.  So those would have been the people in, you know, in the vicinity of where this occurred.  I don't have anybody else listed in the accident report as being in the area.

Q.   Would a housekeeping supervisor usually have drinks that they come and offer passengers?

A.   No.

Q.   Okay.  So is it -- and I am not trying to put words in your mouth, but I just want to make sure that we are all on the same page and I understand.  Is it your testimony that whatever crew member may have come out for drinks, Carnival has no idea who that is and has no way to find out who that person was?

A.   The only information I have about anybody coming by with drinks is directly taken from her deposition.  I don't see that that's listed anywhere in the -- in the accident report.  I don't -- in fact, I am going over her guest injury statement again, and I -- I don't see that she mentions anything like that in her own statement.  So I have no information about anybody coming by with any drinks.  The only people are the ones that I've mentioned.

Q.   Okay.  And there is no -- and there is really no way for Carnival to know anything about this person

Page 22

because there is no information in the accident report; is that correct?

A.   I am not sure if it -- you know, again, the only information I have to go by is her deposition testimony.  She didn't write this down in her passenger injury statement.  It -- one of the questions is who was with you or nearby at the time of the accident.  It says, three cabin mates -- I am sorry, three cabin mates and multiple cruise goers.  Room 8461 came over.  They witnessed the whole thing and told staff.  I don't see anything about anybody offering her drinks.  I don't know of any identity of anybody that would have been up there serving drinks.  So again, the only information about that came from her deposition, so I am not sure who that would have been or even if anybody would have been up there offering drinks.

Q.   Okay.  All right.  Is there any indication of how long Ms. Wampole was in the -- in the hatch?

A.   Not in the accident report.  I can go through it quickly, but I don't believe it states a time.  I believe in her deposition she said it kind of happened quickly, and I don't think she gave a time either.  It wasn't a prolonged amount of time.  It kind of -- she fell through, and it is my understanding she was able to sit up, and I believe that's what we see in the

Page 23

pictures as well. She is kind of sitting on the edge of it, so I don't believe she ever fully fell in or, you know, sat in the hatch or anything like that.

Q. Okay. Is there any mention of the condition of the wood or the structure in the accident report like, you know, does it mention anything about the frame being broken or, you know, anything like that, the condition of the wood or the structure?

A. Sure. I can look. So it says the area of the accident was inspected, along with the aquatic attendant, and they noticed that one section of the deck was damaged, and they had noticed that the damaged wooden material was removed from the area, which means the old hatch door, and it was temporarily replaced with plywood. The area was cordoned off for safety reasons and then there was an e-mail sent out to the facility maintenance manager who stated that the hatch would be fixed and rectified, and then they went ahead and they fixed that by April 11th. April 11th the facilities maintenance manager confirmed via e-mail that the hatch was replaced and fixed. That's all of the information that I have about the actual, you know, damaged wood or hatch.

Q. Okay. And just to be clear, this plywood, this was applied only after the incident happened, not

Page 24

before; is that correct?

A.   Yeah.  It was a temporary replacement while they were able to -- to fix the hatch door.  I believe it was replaced with new wood, so while they got that ready, they put a piece of plywood over the area, and they secured it with -- the area was cordoned off it says.

(Plaintiff's Exhibit No. 10 was marked for identification)

BY MR. HAYASHI:

Q.   Okay.  Okay.  Let me show another photograph. I will mark this as Plaintiff's Exhibit 10.  Have you seen this photograph before?

A.   I have.

Q.   Okay.  Does this photograph fairly and accurately depict this plywood that we are talking about that was applied as a temporary measure after the incident?

A.   I believe so.  That looks like plywood to me.

Q.   Okay.  In the accident report does it mention anything about what, you know, the condition as it was when they -- when they first arrived, you know, like the place looked like it was in good condition other than being collapsed?  I am not sure how they would describe it but, you know, because, you know, in a lot

these accident reports they -- they say area looked like it was in good condition.  I assume it is not going to say the whole thing looked like it was in good condition here, obviously, but do you know if there is any type of statements like that in there?

A.   Well, I just went through everything with --

MR. JARNAGIN:  Object to the form.

THE WITNESS:  I am sorry.  I just went through everything with you and there is nothing additional, like I already stated.

BY MR. HAYASHI:

Q.   Okay.  Well, thank you for clarifying that or making it clear to me at least.

All right.  Just while we are on this photograph, is it just me or does it look like some of these wooden planks here on the structure are kind of darkened and some are lighter?

A.   I -- yeah, I mean, it could be a shadow, it could be the way the picture was taken.  I am not really sure.  It is wood, so wood changes.  You know, there is different shades to the wood.

Q.   Right.  Even though it is because this -- this part is like more wet than the other parts, or if it is just designed this way, you don't know?

MR. JARNAGIN:  Objection to form.

THE WITNESS:  I don't believe that it is wet. I don't see any wetness in the picture, but I mean, wood varies.  There is different -- wood grain looks a little different in every plank, so I think that's just normal in teak wood.

BY MR. HAYASHI:

Q.   Right.  And where is the jacuzzi relative to this photograph?  It is on the left?

A.   Correct.

Q.   Okay.  Are we looking at the corner of the jacuzzi here that's casting the shadow?

A.   Yes.

Q.   Okay.  Do you know if this -- I mean, this jacuzzi must use chlorinated water, like jacuzzis typically do, right?

A.   I am not sure.

Q.   Okay.  I suppose -- and I suppose you wouldn't know what the effects are of chlorinated water, like how that might affect the wood, would you?

A.   No.

Q.   Okay.  I assume that's more of a design issue, if anything, right?

MR. JARNAGIN:  Objection to form.

THE WITNESS:  I don't know if that would be a design issue.  I am not really sure.  That wasn't

Page 27

on the notice, so I am not really sure who would know.

BY MR. HAYASHI:

Q.   Yeah, well --

A.   Is anyone at Carnival, I am not sure.

Q.   All right.  I didn't specify chlorinated water, but you know, the -- anyway, but we will go on.

Okay.  So let's go back then to the -- to the prior incident search.  And just by way of background, do we know -- so do we know if this structure that was added to this ship in 2017?  Was that added to any other ship or it is only on this ship?

A.   Well, like I said, it is found on the conquest class.  They are the only --

Q.   Right.

A.   -- class in the fleet that would have a setup like this one.

Q.   And were they all added at the same time in 2017 or around the same time?

A.   I am not sure.

Q.   Okay.  But they all -- they all go back five years, right, the ones that were installed on the class?

A.   I believe so.

Q.   Okay.

Page 28

A.   Correct.

Q.   And no incident of this hatch opening, you know, unintentionally was found in any -- on any of the sister sets or this ship previously?

A.   Correct, for a five year time period that was searched.

Q.   And just so we are clear, it is not just that there was nobody injured, nobody complained about the hatch coming loose or anything like that either; is that correct?

A.   There is no mention of the hatch in any way.

Q.   Okay.  And no -- there is no -- there is no complaints or incidents -- I mean, there is no complaints, you know, concerning, you know, in any other, I guess, floor collapsing like you said or hole opening on both this and the sister ships that have this structure.  Even if there wasn't an injury, there is no complaint about the floor coming loose or anything like that, even if it is not exactly mentioning the hatch?

A.   Correct.

Q.   Okay.

A.   There are none.

Q.   There is no -- and just so we are clear, and I am just trying to cover all my bases, there is no

similar type of wooden structure built outside of the class even if it is not built exactly the same way, like there is no wooden elevated jacuzzi structure of any kind?

A.   Not like this, no, nothing with teak wood, nothing with a hatch like this.

Q.   Right.  And not just teak wood, but I mean, you know, there is no marble structure with an elevated jacuzzi that has an openable hatch or --

A.   No.

Q.   Yeah, or any -- or bullied, or any other type of non-wood material either?

I am sorry.  All right.  And it is not like there is any other similar type of structure that doesn't have a hatch, you know, like this elevated jacuzzi-type structure.  It is not that the hatch is the only thing making it different, is it?

A.   No.  I had searched for and I asked the fleet if there was anything elevated, if there were any -- I am sorry, I am a little distracted.

Q.   Sorry.

A.   Okay.  Yeah, I asked for the construction that is similar to this where it is like an elevated platform with like an accessible area underneath.  I asked about the flooring.  I asked about the hatch

opening, basically anything similar to this, whether it was teak wood or not, but accessible in the same way, and it would only be the conquest class.

(Plaintiff's Exhibit No. 3 was marked for identification)

BY MR. HAYASHI:

Q.   Okay.  Thank you.  All right.  I will move on then.  I am going to mark this as Plaintiff's Exhibit 3.  You recognize this document, right?

A.   I do.

Q.   All right.  This is the supplemental answers to the initial interrogatories served by Ms. Wampole, correct?

A.   Yes.

Q.   Okay.  And so let's start with this.  There is no -- there is no CCTV cameras that capture the jacuzzi; is that correct?

A.   Correct.

Q.   Right.  And there is no body camera footage, right?

A.   No.

Q.   Okay.  All right.  And that just so we are clear on numbers seven and eight, I know seven we just went -- we just went over, but it has this language of -- this has this language of during the three years

Page 31

prior excluding March 13th.  But just so we are clear, the search was revised to five years prior, correct?

A.   Yeah.  It was sent to your office yesterday. I believe we just went over it before this document.  I think you showed it to me.

Q.   Right.  Well, just -- what I am getting to is number eight I don't believe was supplemented, but just if we can clarify on the record, because I think you did testify to it, but you also searched five years for any prior complaints, even if that didn't come out in a formal supplement?

A.   Right.  So the iCare database would not have been able to have been searched for the full time.  It only goes back a certain amount of time from present date, I believe it is three years, so at the time it was searched from May 2022.  At this point in time it would have been June 2022, so I couldn't do iCare.  The data just doesn't exist, however, T-GEM, which is the service, the post-cruise service -- I am sorry, Mr. Hayashi, do you want to take a break while -- because I am very distracted with what is going on in your office.

Q.   Okay.  Well, let's take a small little break right now.

THE VIDEOGRAPHER:  Okay.  All right.  Let's

Page 32

go off the record.  Going off the record.  The time is 11:14 a.m.

(Recess taken)

THE VIDEOGRAPHER:  We are on the record.  The time is up 11:15 a.m.

BY MR. HAYASHI:

Q.   Okay.  So if I understand correctly, basically the T-GEM did go back five years but the iCare can only go back three years?

A.   Correct.

Q.   And that's because --

A.   Well, three years -- sorry to interrupt, three years from present date, so the search was done from May 2022 through the date of the incident on the iCare database, but T-GEM did go back the full five year amount of time.

Q.   Okay.  And for any -- and when we see this language repeated, for example, in ten, just so we are clear on the record, when this says excluding March 13th, 2020 through July 2nd, 2021, does that actually mean that -- does that actually mean that they -- it is three years plus this amount of months and days between March 13th and July 2nd, like this -- it is not that this timeframe was not searched, correct?

Page 33

A.   Well, the timeframe wouldn't exist really. We were paused for Covid, so our operations were paused at that time.  We had no guests on board from March 13th, 2020 through July 2nd, 2021.  We were out of service.

Q.   Okay.  Right.  Well, what I mean is is this time was added on the back end though.  I don't think this was necessarily clear.

A.   Yes.

Q.   Right.  So basically that timeframe -- yeah, I think we are on the same page.  There was no further dry docking either of this -- that affected this wooden jacuzzi structure from 2017 through date of the incident, right?

A.   No.

Q.   Okay.  I believe a couple work orders were produced, but there is -- there is no other maintenance you are aware of the jacuzzi structure or between 2017 -- or I guess in the last, you know, three years, plus the -- this period specified here?

A.   Right.  Yeah.  There were two work orders produced, nothing for the hatch or the floor.  I believe it was the varnishing of the actual like whirlpool structure, and there might have been a leak of some sort that the whirlpool might have had.  I

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 34

think those were the two work orders that were produced.

Q.   Okay.  We will see those in a little bit, but -- okay.  All right.  And I guess in 17 and 18 here are design, so I will -- I will skip those since I pretty much asked these upfront.  Well, I guess just quick, there is no dispute that -- that this jacuzzi structure was added at the request of Carnival, so Carnival did, you know, did specifically request and make, you know, ordered that this jacuzzi structure be made, right?

A.   I would only be speculating at this point.  I don't know.  I would have to, you know, do the research and make sure that what I am telling you is accurate, so I don't want to give you, you know, the wrong information as I sit here today.

Q.   Okay.  I guess just in an abundance of caution, you are sitting here today, you don't know -- I am guessing you don't know the make or model or brand of this whirlpool or -- I don't know if the structure has a brand, make or model either, but you don't know the brand, make or model of either the jacuzzi or this structure that it is encased in, right?

A.   Not of the jacuzzi, and I don't know if there is a make or model for the floor in the area.

**DARLENE WAMPOLE vs CARNIVAL CORPORATION**
**Monica Borcegue on 06/11/2025**

Q.   Right.  And I don't suppose you know if this -- if this structure is somehow, you know, like made by the same company as jacuzzi or something like that.  I don't suppose it is, but I am just curious.

A.   I don't know.

Q.   Okay.  I think we went over the rest.  You don't know the -- if there was another company that was hired to install at this time, right?

A.   Right.  Again, it would have to be researched.  We don't have that information as I sit here today.

Q.   Ditto for the -- if there was a manufacturing company it was purchased from, correct?

A.   Correct.  None of that information.

Q.   Okay.  Okay.  Now for 19, when -- when Carnival states there is no policies and procedures specific to this area -- well, let me just ask this. There is no -- there is not even any policies like, you know, don't run around the pool, or anything like that or -- I know you probably didn't have that in mind with this answer, but just curious if there is -- this was like excluding like general pool rules, I am guessing?

A.   And it is not really a pool.  It is a whirlpool.  I don't know that any pool rules would apply here.  I'm not really sure what policies and

Page 36

procedures you would be looking for.

Q.   Not necessarily --

A.   I am reading the request --

Q.   Go ahead.

A.   -- and -- I am not sure.

Q.   Well, just so we are on the same page, sorry. Just so we are on the same page, I am not necessarily claiming that I'm saying the whirlpool specific, you know, rules, like no running or something are particularly relevant here.  I just want to make sure that the answer wasn't -- it didn't have that in mind, and that's probably fair.  I just want to make sure I understand the scope of the answer.

A.   Well, I -- let me understand the question first.  It is -- it is stating if there is any changes to any policies, procedures and protocols with respect to the subject area.

Q.   Oh, got it.

A.   If they have remained the same or if there is any changes and there are no policies to make changes to, so there is -- there is nothing that pertains to that area.  That would have been changed as a result of this or -- I believe it says prior incidents or complaints, which there are none but --

Q.   Okay.  Well, I know it can be distracting but

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

-- and I can take it off, if you'd like.  Let's just forget about the interrogatory for a second.  I mean, there is no -- there is no policies and procedures that have to do with this -- this jacuzzi structure.  I am not talking about jacuzzi specific policies, but like Carnival doesn't have any type of rules like, you know, only wear this type of shoes or, you know, don't -- don't step particularly harshly.  There is nothing like that to the best of your knowledge, right?

A.   Relating to this area, no, there is not.

Q.   Okay.  Okay.  And yeah, just going to 21, is it fair to say Carnival is not taking the position that this incident was somehow Darlene Wampole's fault?

A.   Not as I sit here today.  I believe it was just an accident.  It collapsed under her weight and that's, you know, what occurred.  I don't believe it is anybody's fault.

Q.   Sitting here today you are not aware of how frequently this -- this wood, for example, has to be, you know, treated or inspected to make sure it is in good condition, do you?

A.   It is cleaned everyday.  It is visually inspecting by housekeeping everyday when it is cleaned.  There are people assigned dayshift and night-shift to clean the area, so if there was anything wrong with the

DARLENE WAMPOLE vs CARNIVALCORPORATION
Monica Borcegue on 06/11/2025

Page 38

area, you know, the work order procedure is in place where they would have repaired it or maintained it if needed.  You have the work orders.  There is nothing about the floor in the work orders.  There haven't been any issues with the floor for the five year time period that we searched.  So really the floor is, you know, looked at every single day by our staff.

Q.   So for these daily inspections, is both the -- is only the surface like the part that you can see, the passengers can see inspected, or do they also inspect underneath the hatch?

A.   We wouldn't open the hatch or go underneath the hatch unless maintenance needs to do that for the jacuzzi.

Q.   Do you know how frequently the area underneath the hatch is inspected?

A.   I don't believe that any inspections occur. It is only accessed if we need to access the jacuzzi for a certain reason.

Q.   Well, right.  So the visual inspections only cover the top part that's visible to the passengers, correct?

A.   Sure.  It is -- it is how it is cleaned.  So these are visual inspections that are done when the deck is cleaned and maintained everyday.

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 39

(Plaintiff's Exhibit No. 4 was marked for identification)

BY MR. HAYASHI:

Q.   Let me -- I am going to cast this one.  I am going to mark this as Plaintiff's Exhibit 4.

You recognize this document too, right?

A.   I do.

Q.   This is the initial answers from Carnival to Ms. Wampole's interrogatories, correct?

A.   Correct.

Q.   Okay.  So one I think I already asked. That's basically I wanted to know if you have any information about the person that served drinks.  We don't.

Okay.  Nine we literally just discussed, inspections and monitoring.

Okay.  We discussed 11 as well.  Okay. Turning to 14, I know it says there is no warnings or instructions specific to the floor in the area.  Do you know if there is any type of warning signs at all, even if the warnings are just like "Watch Your Step" generically?

A.   The whirlpool would have its own whirlpool signage, but that's more about the use of the actual, you know, how to not -- for anything, you know, about

Page 40

the step or the area itself, it would be specific to the hot tub.

Q.   I understand.  I understand your position. My question is is do you know if it has language like quote, "Watch Your Step", end quote; do you know?

A.   I don't know exactly what the whirlpool sign would contain.  I would have to look that up.

Q.   Is there any other sign or just the whirlpool sign, basically?

A.   I believe it would just be the whirlpool sign.  It is my understanding there are no other warnings in the area.

Q.   Thank you.

A.   Or any signs in the area, I should clarify.

MR. HAYASHI:  Well, Mr. Jarnagin, in an abundance of caution, and I am sure you have -- you know, I would like to -- I would like to see this whirlpool sign.  Is that possible?

MR. JARNAGIN:  You should ask Mr. -- or Dr. DeCoso, your expert.  He probably has pictures.

MR. HAYASHI:  Okay.  Well, let me -- yeah, that's a -- that's a good avenue.  Okay.

BY MR. HAYASHI:

Q.   All right.  Let me -- and I guess just so we are on the same page, the whirlpool sign wouldn't have

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 41

changed from the time of Ms. Wampole's incident from the time that the ship inspection in this case occurred, right?

A.   Correct.

Q.   Okay.  Okay.  All right.  So that's the affirmative defenses.  Give me a second here.  I think we already touched on affirmative defense A, but if there is something that Ms. Wampole did that somehow contributed to her incident, you are not aware of that today, right?

A.   Right.  As I sit here today, I have no -- no information to provide.

Q.   And that includes, you know, inebriation, intoxication, or otherwise, having too much to drink, that's -- that's not something Carnival is claiming about Ms. Wampole, right?

A.   No.

Q.   Okay.  All right.  So that covers B as well. For C., is Carnival taking the position that she didn't go to the medical center right away, or is there some other type of failure to mitigate that you are aware of factually speaking here?

A.   So I wouldn't have to defer to a medical expert.  I haven't reviewed any records outside of the shipboard medical records, so I would be leaving that

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 42

to a medical expert.

Q.   All right.  I think we touched on D, too.  I assume E as well, you have to defer to a medical expert as to the preexisting injuries or conditions, correct?

A.   Correct.  I am aware that she testified to prior conditions in a previous fall, I believe, but I have not reviewed any of her medical records outside of the shipboard medical records, so yes, I would defer to a medical expert.

Q.   Okay.  Are you aware of any factual circumstance or condition involved in Ms. Wampole's incident that made it open and obvious to her at the time that it occurred?

A.   So if it happens the way she claims, then it wouldn't have been seen by anyone, not her or us.  It is something that just, you know, was kind of unexpected and had never happened before and we couldn't anticipate happening.  I don't think that it would have been something anybody could have seen.

Q.   Okay.  And Carnival is not taking the position that Ms. Wampole is barred by the ticket contract in some way sitting here today, right?

A.   No.  I believe they have complied with -- you've complied with all the terms.

Q.   Okay.  I appreciate it.  All right.  I have

Page 43

about ten exhibits, and we are at four.  I think we are making good progress.

All right.  I am showing you what I am marking as Plaintiff's Composite Exhibit 5.

(Plaintiff's Exhibit No. 5 was marked for identification.)

BY MR. HAYASHI:

Q.    Yeah.  Do you recognize this document?

A.    I do.

Q.    All right.  This is a document that was produced in Carnival's initial disclosures, correct?

A.    Yes.

Q.    Okay.  All right.  And I am going to skip ahead to -- this is the security officer watch report we are looking at on Bates stamp six, correct?

A.    Correct.

Q.    Okay.  This -- so I think reading it is just going to be a little more efficient.  This says, quote, The said area was inspected along with senior aquatic attendant Permata and noticed parts of wooden deck seem to be soft and damaged, thereby, area was cordoned/secured for safety reason, cordoned -- I am sorry.  Pertinently, an e-mail sent to concerned departments regarding accident safety concern as per facility maintenance manager Yordan Petrav, 499586.

Page 44

The damaged part of the wooden deck was immediately replaced with temporary plywood and the cracks would be rectified and additional support will be added to mitigate similar situation.  Correct?

A.   That's correct.  You read it correctly.

Q.   Okay.  Um, when this says -- when this says that parts of wooden deck seem to be soft and damaged, do you have any idea which parts he is referring to?

A.   No.  It would have been his observation during his watch or during his shift.  That's the only mention that I see about the floor.  As you know, we have already gone through the investigation, and there was nothing further that was mentioned about the condition of the floor, so these were only his observations, and I wouldn't be able to give you any further detail on that.

Q.   Okay.  If you don't know the answer to this, you know, I understand, but is it your understanding that wood -- that wood can become soft if it becomes -- if it becomes very wet?

MR. JARNAGIN:  Objection, form.

THE WITNESS:  I don't know.  I'm not really sure about how that works.

BY MR. HAYASHI:

Q.   Okay.  And that at least seems to be what --

Page 45

what is being implied here though, right, like it is --
it is soft and damaged nearby?  Well, I suppose you --
I mean, do you know what is being implied here?

A.   No, I don't.  Again, it was his observation,
so I can't speak for him.

Q.   Okay.  You are aware that the expert that we
retained in this case believes that the -- that the
wood became damaged because it -- I believe it wasn't
maintained properly over a prolong period of time.  It
became, you know, the water -- the water can I believe
cause damage over a prolong period of time.  Are you
familiar with that?

A.   I don't really know what your expert, you
know, what conclusion he came to.  I -- I know there is
a report, but I have not looked at it in detail.  If
that's what you are stating then I -- you know, the
document I guess would speak for itself, if that's in
the document.

Q.   Okay.  All right.  And we -- we know whatever
this soft and damaged condition that this senior
aquatic attendant Permata is noting.  He was able to
open it when he inspected the area, correct?

A.   Well, this is the security officer's watch
report.  It says, the area was inspected along with the
aquatic attendant, but the observations are of the --

Page 46

you know, of the officer on watch, so I don't know if the aquatic attendant would have made the same observations.

Q.   Okay.  Fair enough.  But we know, whatever this condition is that the security officer is observing, it was certainly able to be observed by him when he inspected the area immediately after the accident, correct?

A.   I mean, it is in the report.  I don't know that I understand your question.

Q.   I think we will agree it is in the report, so I will move on.  Oh, the last part -- I know this isn't highlighted, but additional support will be added to mitigate similar situation.  Do you know what that is referring to?

A.   I am not exactly sure what it is referring to in his report.  I know that after the fact they did add a beam underneath that wasn't in -- in that area before.  I believe that's how they rectified it underneath, but I am not sure if that's what he is referring to or not.

Q.   Okay.  When was this watch report taken?

A.   So every security officer would fill out a watch report for their shift for that day, so this would have been April 5 and 6, 2024.  It goes -- you

DARLENE WAMPOLE vs CARNIVALCORPORATION
Monica Borcegue on 06/11/2025

Page 47

know, it covers part of one day and part of the next. They are on the shift -- well, you can see the times there, so they are on 12:00 p.m. to 6:00 p.m. and then 12:00 a.m. to 5:00 p.m.  So it -- it is done as their shift goes on.  They will note any kind of, you know, discrepancies or incidents or anything that they come across during their watch.

Q.   Right.  But this -- this would have been like -- this would have been shortly after the accident where -- it says date, April 5th through April 6th, right, up here?

A.   Well, the time is on the left.  You can see time.

Q.   Right.  Right.  Well, I understand that it is based on observations that are happening at this time. I guess I am just trying to clarify when the actual report was drafted.

A.   I am not sure.  There is -- there is no set time for that.  They will make notations on their watch, and then they type it up -- I am not sure if that's done as part of their watch, at the end of the watch, or you know, I am not sure how that is done. That would be I guess a question for that officer.

Q.   Okay.  Well, it is safe to assume that whatever the support that's -- that's being said will

Page 48

be added.  It probably wasn't able to be added within just a day or two, right?

A.   I've already looked that up.  Like -- let me pull it up again.  I believe it was done by April 11th. I can doublecheck that.

Q.   Okay.

A.   Yeah, according to the investigation by April 11th, it was an e-mail from the facilities maintenance manager that confirmed that the hatch was reinforced and that the work was completed.

(Plaintiff's Composite Exhibit No. 6 was marked for identification)

BY MR. HAYASHI:

Q.   Okay.  So I am going to mark this as Plaintiff's Composite Exhibit 6.

This -- this is basically the red dot, blue dot charts, correct?

A.   Correct.

Q.   Right.  So I see there is only one red dot. I am guessing that's Ms. Wampole?

A.   Correct.

Q.   Okay.  And then the second and third page are the work orders that we were discussing earlier, correct?

A.   Yes.

**DARLENE WAMPOLE vs CARNIVAL CORPORATION**
**Monica Borcegue on 06/11/2025**

Page 49

Q. All right. And I see one -- one of these it is dated October 28th, 2021. And this one states in the subject compliance line, "Deck 14 portside whirlpool leaking from pump and rust casing," right?

A. In the subject line. The compliance line is a different line.

Q. Oh, okay. All right. Subject line -- I got it. But that's the subject line, correct?

A. Correct.

Q. Do you know what that means, rust casing?

A. No, I do not.

Q. Okay. There is no way -- there is no way for Carnival to know. These are just notes that are taken down and there is no database or more detailed notes or anything like that, right?

A. Correct. You are looking at the full work request and work order, and this is the extent of the information that we have for that job.

Q. And then there is one from June 11th, 2022. In the subject line it says, "Deck 14 forward portside whirlpool varnishing to be done," right?

A. Correct.

Q. All right. That just has to do with painting, like a painting type thing or --

A. Yeah, they varnish the -- the actual

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 50

whirlpool structure.  You can see it in the pictures that it is like a varnished wood.  It is different from the floor teak.  It is kind of like a darker brown, so they -- they do the varnishing every so often.

(Plaintiff's Exhibit No. 7 was marked for identification)

BY MR. HAYAHSI:

Q.   All right.  I will mark this document as plaintiff's -- all right.  I am going to mark this document as Plaintiff's Exhibit 7.  And you recognize this document, right?

A.   I do.

Q.   Okay.  So we have already discussed the accident report, but what is the investigation report again?

A.   It is an additional document with the -- the investigation summary.

Q.   Okay.  And what is that investigation summary again?

A.   That's what I was referring to, to give you the information.  The accident report itself is just like a form.  It has got certain fields of information that's kind of like standard information, but the investigation report is really where the investigation is recorded, so that's what I was referring to --

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 51

Q.   I think -- yeah.  Right.

A.   -- before.

Q.   Basically it is attached to the accident report, right?

A.   Correct.

Q.   Okay.  I think -- I think sometimes it is just considered the same document, but I understand. Then we have a few witness statements.  I will try to get through this efficiently but one is by Paige Wampole.  And -- do you have that?

A.   I can access it, sure.

Q.   Okay.  Same agreement.  We are not claiming any waiver of privilege, but I am curious what -- what was observed or what -- yeah.

A.   Okay.  Give me one second.  They are all pulling up.  Okay.  You are asking about Paige, correct?

Q.   Paige Wampole, yeah.

A.   Okay.  I have got it.  I mean, what was --

Q.   Yeah, so Ms. Wampole's daughter -- yeah, does she describe anything differently from Ms. Wampole or is it essentially the same, same description?

A.   So basically walking around hot tub on Deck 14, she says her mother fell through the floor, went a few inches into the hole.  She found the nearest crew

**DARLENE WAMPOLE vs CARNIVAL CORPORATION**
**Monica Borcegue on 06/11/2025**

Page 52

member who was at the water slide.  She states that

another crew member came and asked if we wanted drinks.

She said, no, we were waiting for help.  And then the

slide member came back and told us that he had a

supervisor coming to help and at that point in time

they took her mom to a wheelchair to get taken to

medical.  That is the extent of her statement.

Q.   Okay.  I am just curious, how for away in feet, approximately, is this water slide?

A.   I am not sure about measurements.

Q.   Okay.  Well, if we can just visualize, and I can pull up the photograph again, if that helps, but I mean, like how -- like I guess how close would it be if we are -- I mean, it is not at the end of the ship basically, right, the slide?

A.   No, it is towards the forward end of the ship, but I wouldn't be able to give you measurements at all.

Q.   It is close enough that you can see the water slide from the -- from the whirlpool area, right?

A.   I -- I don't really know if there is something that gets in the way of that.  I believe that there might be a structure in the middle that, you know, if you are standing by the whirlpool, I am not really sure what you can see.  The slide is actually

Page 53

like a deck down.  Like the actual slide ends on a few decks below, so I am not really sure what you can see from the whirlpool area.

**Q.  Okay.  Who is Lara May?  That's one of her --**
**I am sorry if that's one of our witnesses and**
**I forgot, but I am curious.**

A.  Lara, she -- yeah, she is one of the travel companions.

**Q.  Okay.**

A.  I believe she is her friend.  I am not really sure of their relation.

**Q.  All right.  Well, what does her witness**
**statement say?**

A.  Okay.  So she states they were walking around checking out the ship.  They got to the end of Deck 14 next to the hot tub.  Darlene was the first to start walking when she fell through the floor.  They told her to sit down and stay there until they found a crew member.  The water slide guy came.  He said he was going to get someone, then they brought a wheelchair and took her to medical where she was for several hours taking X-rays, she had a tetanus shot, pain medications.  They said that they needed to go to guest services to get a wheelchair.  I guess she means if they wanted to use one for the rest of the cruise.  And

Page 54

it says, this incident happened Friday, 4/5/24, at 1:15 p.m.  That's the extent of her statement.

Q.   Okay.  And there is a statement by Karl Nelson.  I am guessing that's another travel companion, right?

A.   He is not.  He is just a guest that was in the area.  My understanding is he is the one that she mentions from Cabin 8461.  I believe that's in her statement.

Q.   Okay.  All right.  What does he say?

A.   So he states that on April 5th at approximately 1:15 he and his wife were in the surrounding area.  They observed three females on the deck above them at the hot tub.  They were walking on the deck below, and he was -- I can't understand what that word is -- I think directed by a sound above him, so he looked up and he saw that one of the females had fallen.  He called up to make sure if she was okay.  He called up to the people, "Is she okay?"  And then him and his wife walked towards the Serenity Bar looking for a crew member.  They reported that a woman had fallen at the hot tub above, and then they walked upstairs.  They saw her with an icepack.  They saw that the floor had given out, and he saw redness and slight scrapes on her leg, on her right leg, and I believe it

Page 55

says, we encouraged her to see the ship's medical staff.

Q.    Okay.

A.    And that's the extent of his statement.

Q.    Okay.  Beth Shaw, I think I recall that is one with of her travel companions, right?

A.    Who?

Q.    Beth Shaw, the next one.

A.    Yes.  Correct.  Yes.

Q.    What does he (sic) say?

A.    So Beth is a woman.  She says, we came on board, had lunch and then started to explore the ship on Deck 14.  They decided to continue their exploration of the ship.  They started to leave the area.  Darlene led us towards the steps to walk down from the hot tub area, and when walking forward, a square decking area with wooden framing came apart.  This dropped the deck into a hole under Darlene.  And it states she had fallen in with both legs.  A guy from the slide was asked for help, and it says she went to guest services to notify of the incident, and that is what her statement contains.

Q.    Okay.  And then lastly, there are 12 photographs that were taken, and they are all just of the subject whirlpool and the hatch, basically the same

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 56

scope of photographs that Ms. Wampole, you know, somebody from her group must have taken that we just looked at, right?  Like there is no photographs of like her, I don't know, her clothing or any -- of her shoes or anything else?

A.   Well, the 12 photographs were not taken by her travel party.  The pictures you produced are different than these photographs.

Q.   No, no, I am sorry, I am sorry for the confusion.  I meant they show basically the same things, right?

A.   The area generally, but it is different angles, and I can see that there are pictures of how the area was fixed after the incident.  So there are a few pictures of the area before they rectified it and after.

Q.   It is just the whirlpool area and the hatch though.  There is no like photographs of any like wit -- like taken like a witness, I guess, or -- or like her shoes separated from her, you know, from her body or something like that?

A.   No.  It is all of the area.

Q.   Okay.  Needless to say, Carnival isn't taking the position that Ms. Wampole's shoes had anything to do with this incident, right?

**DARLENE WAMPOLE vs CARNIVAL CORPORATION**
**Monica Borcegue on 06/11/2025**

Page 57

A.   No.

Q.   Okay.  I think there is one more photograph that we haven't looked at yet, but this is -- I will represent it is another photograph that our client had, and you have seen this before, right?

A.   I believe I have, yes.

Q.   Right.  Now, this one is -- this one doesn't have her sitting in the spot on the right that we saw her in another photograph, correct?

A.   Correct.

Q.   All right.  And actually, we can -- we can see that it is -- it has got some like watermarks, like -- like it looks wet on that side, right?

A.   You might have to zoom in because I can't really see detail.

Q.   Yeah.  Well, I mean, it is discolored.  I suppose -- I don't know if you know what caused this discoloration, but there is some type of clear discoloration going on.

A.   Yeah, it is a different color.  I am not sure what it would be from.

Q.   Right.  Do you think that might have -- do you think that might have been the damage that the -- that the security officer is referencing in the watch report?

DARLENE WAMPOLE vs CARNIVALCORPORATION
Monica Borcegue on 06/11/2025

Page 58

A.   I don't know.  I don't know when this picture was taken, and I don't know what that is on the floor.

Q.   Okay.  Is it your understanding -- well, we are on the same page, right, that Ms. Wampole, her fall would have happened as she is coming from right to left and then this -- and then the hatch, it drops down at the same angle that we are looking at here, so she would have walked past this discolored area right before the hatch would have dropped, right?

A.   You are describing it from right --

MR. JARNAGIN:  Object to the form.

THE WITNESS:  You are describing it from right to left on this picture just to --

BY MR. HAYASHI:

Q.   Yeah, just based on the picture's perspective.  Obviously right and left or relative terms but relative to the picture's vantage point.  I mean --

A.   Yeah, that's correct.

Q.   Okay.  All right.

A.   Again, I don't know if that discoloration was there at the time of her incident.  I don't know when this picture was taken or what that is, but that would have the general direction, you are correct.

Q.   Does any of Carnival's photographs show that

DARLENE WAMPOLE vs CARNIVALCORPORATION
Monica Borcegue on 06/11/2025

discoloration?

A.   I can look through them.

Q.   Okay.

A.   Well, yeah, the floor in that area is a different color.  It is kind of similar to what you have in your photograph.  Again, I am not really sure what that is or why it is discolored.

Q.   It is -- it is in all of the photographs before the plywood change, I am guessing, but I am guessing it is not there when the plywood is installed; is that correct?

A.   Well, when the plywood is installed, it seems to have been taken on a different day so -- and I can't really see that angle.  The angle where it is taken, it is kind of further back, so I don't see that same spot.

Q.   Right.  But whenever you can see the spot though, if it is prior to the plywood being applied, you see it there on all the photographs where that portion is visible; is that correct?

A.   Yeah, I think there is only --

MR. JARNAGIN:  Object to the form.

THE WITNESS:  Yeah, there is only two photographs of it before the plywood was applied, and yeah, I can kind of see the discoloration in the area.  There -- it is a little bit of a

Page 60

different angle, but I do believe that the floor is discolored.

BY MR. HAYASHI:

Q.  Okay.  Okay.  Let me -- as far as you know, there is no -- there is no like, you know, like the Protection Indemnity Club Carnival is a part of or the ship is covered by, or if the Classification Society said it is classified under, there is no standards or guidelines or anything from those -- from those groups that address, you know, hatch safety or anything related to what happened to Ms. Wampole, right?

A.  No.

MR. HAYASHI:  Okay.  Okay.  So I think that's all I have; however, I do -- you know, I do reserve the right, obviously, to question a witness that has more knowledge about the design matters.  I guess we will discuss that.  Yeah, so I am not sure if you have any follow-up questions, Mr. Jarnagin.  I would like to talk to you briefly afterwards, either way.

MR. JARNAGIN:  I do not.  And Ms. Borcegue will read.

THE WITNESS:  Yes.  Thank you.

MR. HAYASHI:  All right.  Have a great day.

THE WITNESS:  Thank you, you too.

Page 61

THE VIDEOGRAPHER:  Hold on one second.  Do we have any video orders, Mr. Hayashi, Mr. Jarnagin?

MR. HAYASHI:  Maybe.  Maybe we will hold off for now.  I mean -- I don't think --

THE VIDEOGRAPHER:  Okay.

MR. HAYASHI:  We got mediation on Friday, so we will probably order it if we don't settle, I guess.

THE VIDEOGRAPHER:  Okay.  Copy that.  All right.  No video order, Mr. Jarnagin?

MR. JARNAGIN:  No thank you.

THE VIDEOGRAPHER:  Okay.  Maureen, do you have anything else?

THE COURT REPORTER:  Would you like to order the transcript?

THE WITNESS:  Yes.  Did you say read?  Sorry.

THE COURT REPORTER:  Oh, no.  Would you like to order the transcript, Matt?

MR. HAYASHI:  Oh, me?  No, no.  Like I said, we will probably wait until after mediation.

THE COURT REPORTER:  Okay.  Just let me know.  And Cooper, do you want a copy if he orders?

MR. JARNAGIN:  We will take a copy if he orders.  Thank you.

MR. HAYASHI:  Can you do me a favor and send

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 62

an e-mail so I know who to -- who to, you know, shoot out an e-mail for ordering.

Otherwise, if it comes up, I have to go through the transcript and --

THE VIDEOGRAPHER:  This concludes the video recorded deposition.  We are going off the record at 12:01 p.m.  Thank you.

(Thereupon, the videoconference deposition was concluded at 12:01 p.m.)

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 63

CERTIFICATE OF OATH

I, Maureen Uebelacker, Notary Public, State of Florida, hereby certify, that the witness named herein personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 24th day of June, 2025.

Maureen Uebelacker

Notary Public - State of Florida

Commission No. HH626127

Expires:  March 17, 2029

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

Page 64

CERTIFICATE OF REPORTER

I, Maureen Uebelacker, Registered Professional Reporter, Florida Professional Reporter, and Notary Public in and for the State of Florida at large, certify that I was authorized to and did stenographically report the remote deposition of Monica Borcegue, pages 1 through 62; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties to this cause, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED THIS day, June 24, 2025.

_____
Maureen Uebelacker, RPR, FPR
Registered Professional Reporter,
Florida Professional Reporter

**DARLENE WAMPOLE vs CARNIVALCORPORATION**
**Monica Borcegue on 06/11/2025**

**Page 65**

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS SHEET

IN RE:   DARLENE WAMPOLE VS. CARNIVAL CORPORATION
         MONICA BORCEGUE
         June 11, 2025

Page    Line     Change                      Reason

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

     Under penalties of perjury, I declare that I have
read the foregoing document and that the facts stated in
it are true.

_____        _____
 Date                     Monica Borcegue