Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 1 of 57

MICHAEL UPTON Corp. Rep.                    July 30, 2025
WAMPOLE vs CARNIVAL                                    1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:24-cv-24361-KMM

Darlene Wampole,

Plaintiff,

vs.

Carnival Corporation,

Defendant.

THE VIDEOCONFERENCE DEPOSITION OF

MICHAEL UPTON
CORPORATE REP. FOR CARNIVAL CORPORATION

Wednesday, July 30th, 2025

10:01 a.m.

Remote Proceeding
Miami, Florida 33134

Gustavo Carmenates
Digital Reporter
Commission No. HH638896



APPEARANCES OF COUNSEL

On behalf of Darlene Wampole, Plaintiff:

    Matthias Masayasu Hayashi, ESQ.
    Aronfeld Trial Lawyers
    1 Alhambra Plaza
    Penthouse
    Coral Gables, Florida 33134-5216
    786-226-3934
    mhayashi@aronfeld.com
    APPEARED VIA VIDEOCONFERENCE

On behalf of Carnival Corporation, Defendant:

    Walter Cooper Jarnagin, ESQ.
    Gray Robinson, P.A.
    515 North Flagler Drive
    Suite 650
    West Palm Beach, Florida 33401
    561-268-5727
    cooper.jarnagin@gray-robinson.com
    APPEARED VIA VIDEOCONFERENCE

Also present:

    George B. Ellis, Videographer



Case 1:24-cv-24361-KMM Document 44-5 Entered on FLSD Docket 08/18/2025 Page 3 of 57

MICHAEL UPTON Corp. Rep.                    July 30, 2025
WAMPOLE vs CARNIVAL                                    3

INDEX TO EXAMINATION

EXAMINATION OF MICHAEL UPTON                          PAGE

Direct Examination by MR. HAYASHI                        5


INDEX TO EXHIBITS

PLAINTIFF'S:

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Areas of inquiry | 7 |
| Exhibit 3 | Photos | 27 |
| Exhibit 5 | Photograph | 48 |
| Exhibit 2 | Purchase Order | 22 |

(Exhibits 1 through 5 were retained.)



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 4 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                                    4

THE VIDEOGRAPHER:  We are now on the record. The time is 10:01 a.m.  Eastern Time on July 30th, 2025.  This begins the videoconference deposition of Michael Upton as corporate representative for Carnival Corporation, taken in the matter of Darlene Wampole versus Carnival Corporation.  The Case number is 1:24-CV-24361-KMM, and is filed in the United States District Court for the Southern District of Florida.

My name is George Ellis.  I am your remote videographer.  Our court reporter -- digital court reporter today is Gustavo Carmenates, and we are representing Esquire Deposition Solutions.

Counsel, if you would, please state your name and who you represent, after which the court reporter will swear in the witness.

MR. HAYASHI:  Yes.  Matthias Hayashi for the plaintiff, Darlene Wampole.

MR. JARNAGIN:  And Cooper Jarnagin on behalf of the defendant, Carnival Corporation.

THE REPORTER:  Thank you, Counsel.

My name is Gustavo Carmenates, notary public and digital reporter in the state of Florida.  I will be capturing the verbatim record of today's proceeding using electronic audio equipment, a computer, and specialized recording software, which is not a form of



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 5 of 57

MICHAEL UPTON Corp. Rep.                                July 30, 2025
WAMPOLE vs CARNIVAL                                                5

stenography.

The witness is located in Miami, Florida, and has confirmed his identity with a driver's license issued by the Department of Motor Vehicle in the state of Florida.

Absent any objection at this time, counsel and the witness agree to my administration of the oath to this witness, and that the final transcript may be used for all purposes allowed by the state of Florida.

Hearing no objection, this shall constitute agreement and stipulation of such, and I will now swear in the witness.

Please raise your right hand, sir.

MICHAEL UPTON,
having been first duly sworn, testified as follows:

THE REPORTER:  Thank you.

Counsel, you may proceed.

MR. HAYASHI:  Okay.

DIRECT EXAMINATION

BY MR. HAYASHI:

Q.  Well, sir, I'm not sure if we've had the pleasure of meeting each other before.  Could you tell us your name for the record?

A.  It's Michael Upton.

Q.  Okay.  Good morning, Mr. Upton.  You're



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 6 of 57

MICHAEL UPTON Corp. Rep.                                July 30, 2025
WAMPOLE vs CARNIVAL                                                  6

representing Carnival as its corporate representative today for purposes of this deposition; is that correct?

A.  That is correct.

Q.  Okay.  And what's your usual role at Carnival?

A.  So I oversee the fleet of 29 ships for all guest-facing maintenance.

Q.  Okay.  So you're -- so you're, like, the corporate overseer of -- of maintenance across all the ships; is that correct?

A.  Well, I oversee Carnival Cruise Line.  So from a corporate perspective, we have multiple brands.  I'm only overseeing the Carnival cruise ships.

Q.  Okay.  Fair enough.  So -- and -- and that's only for purposes of, like, maintenance repair, that type of thing, or do you have other -- other avenues, I guess?

A.  Just -- just maintenance and repair.

Q.  Okay.  You know what the New Build department is at -- at Carnival, correct?

A.  Yes, I do.

Q.  Okay.  And -- and your -- your department is not a part of or connected to that, is it?

A.  They are not.

Q.  Okay.  Yeah.  And the reason why you're being designated here today is because this structure that



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 7 of 57

MICHAEL UPTON Corp. Rep.                                July 30, 2025
WAMPOLE vs CARNIVAL                                              7

was involved in this incident of Ms. Darlene Wampole,
this wasn't actually built by the shipyard and it
wasn't -- and therefore, it wouldn't have been -- like
New Build wouldn't have been responsible over it, and
rather your department would have been; is that
correct?

A.  That is correct.  It was built post -- post
delivery of the vessel.

MR. HAYASHI:  Okay.  All right.  Well, before
we -- before we go further, I'd just like to show you
what I'm marking as Plaintiff's Exhibit -- Plaintiff's
Exhibit 1.

(Plaintiff's Exhibit 1 was marked for
identification.)

BY MR. HAYASHI:

Q.  You received a copy of this prior to your
deposition today; is that correct?

A.  That is correct.

Q.  Okay.  And you've had a chance to review the
areas of inquiry, are lot of these are probably not
going to be applicable to you, but you reviewed them
prior to your deposition today, correct?

A.  That is correct.

Q.  Okay.

MR. JARNAGIN:  And I just want to note for the



record that Mr. Upton is here specifically on areas of inquiry Number 21 and 22.

MR. HAYASHI:  Okay.

BY MR. HAYASHI:

Q.  Well, I was going to ask your -- specifically you reviewed areas of inquiry 21 and 22, and you're prepared to discuss, yeah, the -- these areas of inquiry; is that correct?

A.  That is correct.

Q.  Right.  And this has to do with design, modification, installation, which covers the structure on the ship that Ms. Wampole's incident occurred on, correct?

A.  That is correct.

Q.  Okay.  Since you oversee the maintenance and repair though, I mean, is it fair to say that you -- you may have some knowledge that touches on areas of inquiry 9 and 10, like how it's supposed to be maintained, what type of maintenance may have occurred? I realize you may not know everything, but do you have -- might -- might you have at least some knowledge on these areas?

A.  I do have knowledge on these areas, but not specifically for this -- this project in 2017, as I joined the company in 2017.



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 9 of 57

MICHAEL UPTON Corp. Rep.                                  July 30, 2025
WAMPOLE vs CARNIVAL                                              9

Q. Okay. Well, let's -- yeah. Appreciate it. Okay. All right. So let's circle back. We were discussing that this structure was added to the ship after the ship was built, correct?

A. That is correct.

Q. Okay. Can you refresh all of our recollections, when was the ship built?

A. I don't have the -- the exact date of delivery, but it's over 20 years old.

Q. Okay. But I think that's fair enough. And about when was this structure added to the ship?

A. 2017.

Q. Okay. Could you walk us through the process for how this was added. Like the start, I guess, was, like -- was it during a dry dock or when was this added?

A. Yeah. So it was done during the 2017 dry dock where the vessel was out of service. A contractor would have been hired to do the design and installation of the structure, based on the records that I have.

Q. Okay. And what's the name of the contractor?

A. Tuttotondo.

Q. I'm sorry. Can you repeat that for the record?

A. Tuttotondo.



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 10 of 57

MICHAEL UPTON Corp. Rep.                          July 30, 2025
WAMPOLE vs CARNIVAL                                        10

Q.  Could you spell that for the court reporter?

A.  T-U-T-T-O-T-O-N-D-O.

Q.  Okay.

A.  One word.

Q.  And how did this work?  People -- employees of Tuttotondo came on to the ship and basically built this structure?

A.  They supplied the -- the project turnkeys, so they would have fabricated, shipped, and installed this in that location.

Q.  Okay.  When you say fabricated the ship, what do you mean specifically?  They --

A.  Fabricated -- fabricated the materials related to the project.

Q.  Meaning -- meaning that this was basically all constructed on-site as opposed to, like, constructed off site and lifted on.  I think to just help us lay people understand what that means.

A.  From the -- from the details and documents I have, it seems to be that they fabricated in a workshop in Italy and shipped it, and then would have fabricated or put together onboard.

Q.  Okay.

A.  [inaudible 00:07:47] .

Q.  So please excuse me if I misunderstand, but is



this kind of like how there are some of those, like, prefabricated homes that are kind of, like, built and then just sort of, like, dropped by a crane, you know, into a location rather than being built on-site.  Is that -- is that what you're saying?

A.  No.  From the documents that I see and have, they would have welded it and put it together piece by piece.  There might have been parts that have been entire sizes, but it wouldn't have been lifted as a single unit.

Q.  Okay.  So meaning it's -- it was fabricated on the ship?

A.  Correct.  By the -- the contractor.

Q.  Okay.  I -- I don't know why I -- I got it mixed up, but I appreciate it.  Do you know why this was added?

A.  So we have a brand called Serenity, and this was part of that project.  So the Serenity did not exist, and it was an introduction of that -- that branding as part of this project.

Q.  But is this -- but the structure isn't on any other ships in Carnival's fleet, and by Carnival, I mean Carnival Corporation, correct?

A.  We have similar assets on -- across the Conquest class.



Q.   When you say "similar assets," what do you mean?

A.   Jacuzzis and teak decks in the Serenity.

Q.   Is it a -- is it --

A.   There's five -- there's five vessels in the Conquest class, and they all --

Q.   Yeah.

A.   -- have these Jacuzzis in the Serenity.

Q.   All -- and they're all an elevated structure with a hatch or --

A.   Right.

Q.   -- with --

A.   They are all -- from what I know, they are all elevated structures.  I'm not sure about the -- the hatches per se.

Q.   Are they made of teak?

A.   Correct.

MR. HAYASHI:  Hold on.  Can we go off the record for a second?

MR. JARNAGIN:  That's fine.

THE VIDEOGRAPHER:  One moment.  Off the record.  Time is 10:12.

(A recess was taken.)

THE VIDEOGRAPHER:  Back on the record.  Time is 10:13.



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 13 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                                    13

BY MR. HAYASHI:

Q.   Okay, Mr. Upton.  Are you familiar with -- are you familiar with the discovery that was done in this case, specifically as it pertains to this Jacuzzi structure?

A.   Sorry.  Can you elaborate?

Q.   Well, are you familiar with the disclosure of -- of a -- a search of prior incidents in regards to people who may have suffered injuries involving this Jacuzzi structure or similar structures?

A.   I am not aware of any other incidents related to hatches or -- or guests falling through hatches or hatch issues in decks.

Q.   Okay.  But I just want to be very specific. Are there -- are there any other elevated Jacuzzi structures that have a maintenance hatch on any other ships in Carnival's fleet?

A.   I am not aware of any other hatches in teak decks.  I am aware of the fact that there are Jacuzzis with teak decks that are elevated.

Q.   And are those on the Conquest class?

A.   That is correct.

Q.   But there's no maintenance hatches on those; is that correct?

A.   I'm -- I'm not aware.



MR. HAYASHI:  Well, Mr. Jarnagin, normally -- normally I, you know -- I won't count this as a speaking objection, but I -- I would like a definitive answer on the record that there is no maintenance hatches on any of these other structures on the Conquest class.

MR. JARNAGIN:  Yes.  I can represent that based on Ms. Porsege's [phonetic] prior 30(b)(6) testimony in this case, I defer to her prior testimony regarding that.  But, you know, just for everyone's awareness, I'm -- that is the correct answer is that there's no maintenance hatches on these teak decks adjacent to whirlpool hot tubs.  But even if there were Ms. Porsege ran the prior incident search that was agreed to in this case, and there were still no prior incident results.

MR. HAYASHI:  Thank you, Mr. Jarnagin.  And when you say "no prior incident results," meaning nobody got injured by stepping on or interacting with any type of maintenance hatch on the sister ship three years plus the COVID extension period, correct?

MR. JARNAGIN:  That's correct.  I mean, the exact specific language, I'd defer to Ms. Porsege's prior testimony, but yeah, we're -- we're not trying to hide anything here.  There were no prior incident



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 15 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                                    15

search results.

MR. HAYASHI:  Okay.

BY MR. HAYASHI:

Q.  Let me ask you, Mr. Upton though, if -- if these other structures ever need maintenance, how -- specifically maintenance, like, underneath -- underneath the elevator structure.  If there's no maintenance hatch, how would crew get inside to perform the maintenance?

A.  So there may be other locations where they have access.  But I am not aware of -- of the other locations on these other four ships outside of the Conquest itself.

Q.  Okay.  When you say "other locations," meaning -- meaning like there might be, like, a door on the bottom rather than a hatch on the top type of configuration?  I know you don't know for sure, but is that what you -- what you're thinking of, possibly?

A.  Yeah.  I'm not aware.  I only handle everything that's -- that's facing guests, right?  So something below that deck would be related to another -- another person.

Q.  Okay.  When you say there's this -- there's other elevated structures, is the Jacuzzi on these elevated structures, or is it just, you know, nearby



the Jacuzzi?

A.   No.   It's on the elevated structures, identical to Conquest.

Q.   Okay.   So I'm not -- I'm not in any way suggesting that I don't believe Mr. Jarnagin's representation, but I -- I am just -- I -- I guess it's -- it's just a little odd to me, like, why would only this one structure have a maintenance hatch on the top, but not any of the others.   Do you have any idea why this was unique to the one on Ms. Wampole's ship?

A.   No, I'm not.   I don't have any records related to -- to why that location was chosen.

MR. HAYASHI:   Just in an overabundance of caution, Mr. Jarnagin, do you think you can check with Ms. Porsege again and -- and just -- I -- I just want to make sure that something wasn't lost in the shuffle. I mean, maybe some crew member misunderstood a question or something.   Is it --

MR. JARNAGIN:   Yeah.   I mean, I -- I can go back.   I'll look at Ms. Porsege testimony again as well, but I'm -- I'm telling you we looked at the ships, and she ran the search anyways, even disregarding whether there was a maintenance hatch present or not, and there were no results.   But yes, I will triple back with Ms. Porsege for your peace of



mind.

MR. HAYASHI:  Yes.  Appreciate it.  And even if there were no prior incidents, I would be -- I would appreciate if it could just be clarified, if -- if, for example, there were other hatches, just there were no prior incidents, just -- just because I'm under the -- I was under the impression that there wasn't any hatches.

And if there is, I don't know that that necessarily changes anything, but it just helps us, I guess, know the lay of the land, so to speak.  So much appreciated.

MR. JARNAGIN:  Yeah.

BY MR. HAYASHI:

Q.  But sitting here today, Mr. Upton, you -- yeah, you don't know what -- what type of maintenance access points, you know, may or may not have been installed on these other structures; is that correct?

A.  That is correct.

Q.  But the purpose of this maintenance hatch on this ship from Ms. -- Ms. Wampole's incident, that was to allow crew members to access for purposes of maintenance, the Jacuzzi; is that correct?

A.  I'm not aware because I only oversee the -- the guest-facing, so I wouldn't know why they would



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 18 of 57

MICHAEL UPTON Corp. Rep.                                July 30, 2025
WAMPOLE vs CARNIVAL                                            18

need that access.

Q.  When you say -- you said guest what, sorry?

A.  Guest-facing.  So anything that a guest would see, so that would -- a hatch would be for something that's below in a technical space.

Q.  Well, who would -- who would know about the purpose of the hatch that's not guest-facing?

A.  I would have to say a -- a technical manager.

Q.  Well, let's see.  Let me continue on and we'll see.  Do you have any idea who the technical manager would be, just in case -- just in case we may have to speak to that person?

A.  I would need to go and look at the -- the org chart.  I -- I don't have that off the top of my head.

Q.  This -- so can you walk us through when Carnival wanted to install this -- this structure with say -- with this Tuttotondo or Tuttotondo, like, how -- how is it that Carnival went about working with Tuttotondo to install this?

A.  So from the documents that I have, it shows that we reached out to Tuttotondo and asked them to build this -- this item, but there's no documents related to drawings or acceptance or warranties or changes.  So they would have went to Tuttotondo to create this Jacuzzi asset.



Q.  So Carnival Corporation does not have any type of design drawings or -- or anything for the structure?

A.  I did not locate anything related to that as part of the -- the PO issuance.

Q.  Do you know if Tuttotondo -- Tuttotondo or -- I'm sorry if I'm mispronouncing it.  But I'll just do my best.  Do you know if they have any type of drawings or anything?

A.  The only thing I have is the documents related to CCO.

Q.  In other words you don't know; is that correct?

A.  That's correct.

Q.  And you said the reason why the structure was added was because it was getting added on a -- on a new ship in the -- called the Serenity?

A.  No.  It's a old ship where we added a branding area.  So it was part of a whole deck project.

Q.  Okay.  So basically there -- there -- basically the Serenity was getting -- was getting changed and Carnival wanted the rest of its ships in the class to match the Serenity; is that correct?

A.  That is correct.

Q.  Okay.  Do you know why it was that the -- that Carnival wanted to add this to the Serenity?



A.   Well, the Serenity is the name of the area. So it didn't -- it didn't exist before, so it would have been just a regular deck.  So this was the --

Q.   Oh --

A.   -- the addition of the -- because the ship is called Conquest, but the area is called Serenity.  So it's a location on board that is specifically for adult guests.

Q.   Okay.  I see.  So Carnival wanted to add a new adult area called Serenity to this class --

A.   That's correct.

Q.   -- of ships?

A.   That's correct.

Q.   And any particular reason or just they thought that that would just be better for business?

A.   It was a consistency project.  So all of our ships now have this area.

Q.   Oh, so it's fleet wide.  All -- all ships have the --

A.   Correct.

Q.   -- Serenity now?

A.   Correct.

Q.   I mean -- I mean -- does that mean --

A.   Serenity or -- or similar type of location.

Q.   All right.  Does that mean every ship in



the -- in the fleet has an elevated Jacuzzi structure on it?

A.  No.  They are all different types of installations.

Q.  Okay.  But they all have some type of Jacuzzi and some type of Serenity area where the Jacuzzi is in, whether it's called Serenity or not, some similar type of area, with a Jacuzzi, correct?

A.  They all have a Serenity, but I don't -- I don't believe they all have Jacuzzis, but I don't -- I don't know for sure.  I know that they all have a Serenity-type area.  In some cases, the name is a little different, but it's a similar concept.

Q.  Is it fair to say Carnival is aware that teak wood can -- can rot if it doesn't have routine maintenance?

A.  There are no records related to that that I'm aware of.

Q.  Right.  But just hypothetically -- hypothetically speaking, teak rotting is -- is something that is known can happen if it's not attended to, that'd be correct?

A.  I -- I have not run into any situations related to teak rotting on our -- on our ships.

Q.  Okay.  You're trying to say that because you



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 22 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                                    22

haven't encountered a situation, you don't know how teak would behave, given, you know, routine maintenance or attention?

A.  I've not had any exposure to that situation, is what I'm saying.

Q.  Well, I -- I appreciate that.  And I'm not trying to be difficult, but I'm asking what's called a hypothetical, which just means that, you know, if then. So I'm just asking you to imagine if -- if teak wood wasn't regularly attended to, inspected, maintained, you know, rot is something that could -- that could happen to teak, just in general.

If you don't know, that's fine.  I'm just asking hypothetically.  I know you haven't personally encountered that.

A.  Yeah.  I -- I do not know.

MR. HAYASHI:  Okay.  Let me show you a document marked as Plaintiff's Exhibit -- Plaintiff's Exhibit 2.

(Plaintiff's Exhibit 2 was marked for identification.)

BY MR. HAYASHI:

Q.  Do you recognize this document?

A.  Yes, I do.

Q.  So this is -- this is the purchase order for



the -- the Jacuzzi structure, this wooden structure with the hatch on it, correct?

A.  That is correct.

Q.  Now, is this a purchase order for just the Jacuzzi or does -- or -- or are a bunch of other items that Tuttotondo is installing also included in here?

A.  From what I understand, it was a group of other installations as part of the Serenity project.

Q.  Okay.  On -- turning to Page 4 -- sorry, Page 5, yeah, I see there's one item here, new construction, steel bulkheads, doors.  It says steel bulkheads to be repaired throughout Deck 12 and Deck 14.  Do you see that?

A.  Yes, I do.

Q.  And it says, "Sand, prep, and primer at rusted areas as needed.  White paint and blue skirting to match as per CCL specifications." Do you see that?

A.  Yes.

Q.  What are these steel bulkhead/doors?  Or are these --

A.  A bulkhead is a -- a bulkhead is a vertical structure.

Q.  It's just -- just like a piece of the ship, like a support beam type thing?

A.  Yeah.  I mean, there's not a whole lot of



detail related to the exact locations, but the -- the definition of a steel bulkhead is a vertical wall --

Q.   Okay.

A.   -- that is made out of steel.

Q.   So basically it's related to the structural integrity of the ship?

A.   So it's related to a -- a structural wall.  So I -- I -- again, I don't know the exact locations based on these few words here, so I can't say what exactly it's representing.

Q.   Okay.  But these aren't connected to or related to this Jacuzzi structure in any way, are they?

A.   I'm not aware.

Q.   Meaning you don't know?

A.   I don't know.

Q.   Is there any way we could know, or is this just lost of time forever, and we're stuck with just this basic description we have here?

A.   I don't --

MR. JARNAGIN:   Objection.

THE WITNESS:   -- know.

BY MR. HAYASHI:

Q.   All right.  And it's my understanding that this is the only design-related document that Carnival has that -- that pertains to this Jacuzzi structure on



the subject --

A.   That --

Q.   -- ship; is that correct?

A.   That is correct.

Q.   I mean, you're -- you're familiar with -- are you familiar with something called a furnishing inspection report?

A.   I've heard of the terminology, but it's not something that we deal with.

Q.   So that would only -- that would only apply to, like, a new ship that's being built?  You wouldn't have one drafted up for, like, some structure that's added later on?

A.   We have no records of any design furnishing document and it's not something that we -- we work with.

Q.   Okay.  I just want to be clear though, are -- are you telling us that Carnival did not have any type of -- any type of specific layout of any kind, and just -- and just told Tuttotondo, just, hey, build us a -- a Jacuzzi or, you know, however you want.  Is -- is that how it happened?

A.   From the documents and records I have, don't show anything related to a design from CCL.

Q.   All right.  But my question is, is did



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 26 of 57

MICHAEL UPTON Corp. Rep.                          July 30, 2025
WAMPOLE vs CARNIVAL                                        26

Carnival just completely defer to Tuttotondo to -- to make this however they saw fit?

A. Again, from the details and documents I have, there's -- there's no record of us providing any design to -- to Tuttotondo -- to Tuttotondo.

Q. Certainly, somebody must have gone on the ship after this was installed, and, you know, given final approval before they -- before they let Tuttotondo, you know, go and -- go their separate ways, is that -- would that be correct?

A. I don't have any -- I don't have any documents related to -- to acceptance or -- or design.

Q. Yeah. But it can't -- it can't be that -- that some third-party company just comes and puts something on Carnival ship and they don't -- they don't, in any way, inspect it or anything. Like, they -- they wouldn't just allow customers to go use something put by some third party without at least looking at it first; is that correct?

A. Again, the documents that I have at my fingertips are only related to -- to this purchase order and us providing Tuttotondo the -- the agreement to install this and fabricate this asset.

Q. Do you know if there was some type of phone call with Tuttotondo by anybody from Carnival outlining



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 27 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                                    27

any type of vision Carnival had or anything like that?

A.  I don't know.

Q.  Okay.  But just because -- even if there's no documents, and I'm not saying that there is, but even if there's no documents, it's still possible that there was some type of phone call about this at some point, correct?

A.  I don't know.

MR. HAYASHI:  Okay.  I'm going to mark -- I'll mark this document as Plaintiff's Exhibit 3.

(Plaintiff's Exhibit 3 was marked for identification.)

BY MR. HAYASHI:

Q.  Do you see it?

A.  Yes, I do.

Q.  Okay.  I'm mostly just going to use this to show you certain photographs in it.

A.  Okay.

Q.  Let's go to -- I had it -- I had it up. Finding the -- oh, hey, here's -- here's maybe a good one.  Do you see -- do you see this -- this photograph of --

A.  I do.  I do.

Q.  -- of the hatch?  Okay.  You do?

A.  Yes, I do.  Yeah.



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 28 of 57

MICHAEL UPTON Corp. Rep.                                July 30, 2025
WAMPOLE vs CARNIVAL                                              28

Q.  Okay.  Now, this -- this is the -- this is the -- the hatch on the subject whirlpool structure that was the subject of Ms. Wampole's incident, that she fell in, correct?

A.  From what I understand, this is the -- the location.

Q.  All right.  But this -- but this isn't -- this isn't what it looked like at the time of her incident, right?

A.  I'm not aware.

Q.  Right.  Well, there was at least one change made.  There was, like, a support beam that was added after the incident, right?

A.  I'm not aware of any additions.  And again, there's -- as the documents show, there's nothing related to any modifications or changes.

Q.  I'm going to -- for the -- for the record, this is Page 13, Exhibit 3, Figure 10.  Go down to Page 19, Figure 13.  Do you see these photographs?

A.  I do.

Q.  Okay.  And you -- I mean, you know these are the photographs that were taken on the day of Ms. Wampole's incident after her -- after her fall into this hatch, right?

MR. JARNAGIN:  Matt, I'm just going to say



objection, form.  And just for your awareness, Mr. Upton hasn't looked at all of this.  He was prepared for the design and install, but, you know, you can ask your questions to the extent he has personal knowledge.

MR. HAYASHI:  Yeah.

BY MR. HAYASHI:

Q.  Do you have any -- do -- do you know -- do you have any familiarity with these photographs, Mr. Upton?

A.  I do not.

Q.  Okay.  Well, I'll represent to you that these photographs were taken on the day of the incident of Ms. Wampole.  I'll represent this is Ms. Wampole sitting here.  And -- and you know at least that -- that this woman fell into this -- this hatch, and that's the subject of this lawsuit, correct?

A.  Yes.  From what I understand, yes.

Q.  Okay.  So I'll represent that's her, and that she's sitting on the hatch after it had collapsed, presumably after she got out, of course.  But you don't see -- we -- like, we don't see either of those support beams that we saw.  Like, this is Page 19, we don't see any of these support beams that we see in Figure 10, correct?

There's these at least two support beams,



Case 1:24-cv-24361-KMM  Document 44-5  Entered on FLSD Docket 08/18/2025  Page 30 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                                   30

middle and -- and right side from the photograph.  And when we -- well, at least there's a middle one.  The other one is detachable, but either way, we don't -- we don't see -- we don't see either of these -- either of these beams in these photographs that Ms. Wampole took, correct?

A.  I don't see the -- the one beam.

Q.  The middle one, right?

A.  Not -- not the middle.  It's -- it's the one where the arrow head is pointing.

Q.  Right.  But do --

A.  I don't see the middle because it's covered by the teak catch.

Q.  Okay.  Well, do you know whether -- whether there was a middle one here or if this is just sitting here without a beam in there?

A.  I don't know.

Q.  So you have no knowledge of -- of whether or not any type of support beam was added after Ms. Wampole's incident; is that correct?

A.  No, I don't.

Q.  Do you know if -- if these support beams -- do you know if these support beams are something standard to these types of Jacuzzi structures?

A.  No, I don't know.



Q.  Are you familiar at all with how hatches like this work in -- in general, whether they're on that Jacuzzi structure or not?

A.  Again, I'm responsible for the guest-facing maintenance.  So I understand what a hatch is for, but I don't know why and where and -- and why and, like, the dimensioning and locations and where they would put them.

Q.  Are you aware of that -- do you have any idea if there is any type of treatment that Carnival uses for -- for teak, whether it's on this structure or not, that keeps it from rotting, like, any type of anti-rot treatment of any kind, a --

A.  I'm not aware of any treatment for the -- for the teak.

Q.  But treatment for -- for the -- the teak structure, I mean, that would be a passenger facing matter, wouldn't it?  Teak is passenger facing, right?

A.  But again, you're referring to the rot, which we do not have any record of.

Q.  Have -- you never encountered -- I -- you never encountered rot at any point in your -- in your experience in Carnival dealing with teak even though you're in the maintenance and repair part of Carnival?

A.  That is correct.



Q.  And how -- how long have you been in this position?

A.  Since 2017.  Well, with Carnival since 2017. In my exact position since April of -- or July of '23.

Q.  Okay.  And of course, no Carnival ships were sailing between about, was it -- so ask it when in 2019 -- so in sometime in 2019, and -- and -- or sometime in maybe -- I think it was -- yeah, 2019 and then like, July of 2020?  I'm sorry if I got the COVID dates wrong, but Carnival wasn't sailing during the period where the CDC, you know, wasn't allowing cruise ships to sail, correct?

A.  That is correct.

Q.  Okay.  Any type of rot issues would be less likely to occur if there's no passengers using -- using any of these structures, would -- would that be correct?

A.  I don't know.

Q.  And did you review Ms. Porsege's testimony prior to your deposition today?

A.  I did not.

Q.  Okay.  Well, from what I remember, I think -- anyway, rather than -- rather than her testimony, let me just ask if you -- if you have any knowledge.  Do you have any knowledge of how this structure would be



Case 1:24-cv-24361-KMM Document 44-5 Entered on FLSD Docket 08/18/2025 Page 33 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                                    33

inspected?  Like -- like a crew member is only responsible for inspecting the -- the passenger facing side; is that -- is that correct?

A.  Crew members are -- are responsible for maintaining the vessel, so it would be all areas.

Q.  So including the part underneath the -- the Jacuzzi structure, correct?

A.  That is correct.

Q.  Okay.  How frequently are the crew members supposed to check underneath the hatch to look at the condition underneath, do you know?

A.  I don't know.

Q.  Because that's not your department; is that correct?

A.  That is correct.

Q.  Okay.  I think Ms. Porsege may have already -- may have already discussed this, but I'll -- I'll defer to that instead of asking you about what she said.  I guess I am just curious.  So who -- who would, generally speaking -- oh, yeah, I think you -- I think you already said it would be -- what was -- what's the name of the department that would be responsible for underneath the hatch area?

A.  The technical team onboard and the technical manager that oversees the specific ship.



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 34 of 57

MICHAEL UPTON Corp. Rep.                          July 30, 2025
WAMPOLE vs CARNIVAL                                         34

Q.  Who would be the technical manager who would -- who would have been -- who would have been technical manager at the time of Ms. Wampole's incident?

A.  I don't know.

Q.  Do you know when this -- when this Jacuzzi structure was last modified?

A.  Per the records that I have, it was last installed in 2017, and that's the only detail that I have, or documents related to any modifications.

Q.  You don't know about any modifications after that?

A.  I'm not aware of any others.

Q.  And -- and just for the record, including -- including whether or not any support beam was added or modified, correct?

A.  That is correct.

Q.  Is it Carnival's position that -- that Tuttotondo did all aspects of the design of this -- of this structure and Carnival did not have any input into the design whatsoever?

A.  From the records that I have, that is what it shows.

Q.  But sitting here today, you're not sure if anybody from Carnival, at any point, approved of this



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 35 of 57

MICHAEL UPTON Corp. Rep.                                July 30, 2025
WAMPOLE vs CARNIVAL                                              35

before Carnival accepted it; is that correct?

A. Based on the records that I have, that is what it shows.

Q. Okay. Does Carnival have any type of -- or Tuttotondo, rather. Does Tuttotondo have any type of -- like, I know it's not called a return policy, but like a return policy? Like if Carnival is not happy within a certain period of time, Carnival can -- can request a change or maybe even have it re-done altogether, or some type -- something else. Do you know what I'm trying to ask?

A. I'm --

Q. Like a refund --

A. -- not aware of anything related to the project in general, related to any type of warranty, as there was no warranty documents or -- or any requests for warranty.

Q. Right. Well, presumably Tuttotondo has a warranty on the products it makes for Carnival, right?

A. It depends on the -- the project and the terms of the -- the PO.

Q. The terms of -- the terms of the deal, like -- so there's some kind of contract between Tuttotondo and Carnival?

A. The purchase order that you were showing,



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 36 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                                    36

correct.

Q.   Okay.  So that's the only -- that's -- that's the only agreement between Tuttotondo and Carnival?

A.   That's the only documents that we have related to that agreement to install those assets.

Q.   Does Carnival work with Tuttotondo often?

A.   I have done other projects with Tuttotondo in the past, yes.

Q.   Certainly, there must be some type of -- some type of mutual understanding about, you know, what would happen if Carnival, you know, had any problems with how anything was put together or anything like -- like that, just because I -- I don't see anything specifically addressed here in this purchase order, but surely there must be some kind of understanding between Tuttotondo and Carnival, right?

A.   I don't have any records of that.

Q.   Let me -- let me just go back to this for a second.  It says here on the very top on each page, "Wood packaging used on all supplier shipments must be in compliance with ISPM 15 and marked with IPPC logo. All shipments not in conformity will be subject to refusal by our warehouse, and all related costs will be billed to vendors." What is that referring to?

A.   This is referring to the logistics of the



shipment of the materials.  So pallets and palletizing of the -- of the material shipment.  So it's a boilerplate logistics note for all purchase orders.

Q.  So like the container that it comes in, not the actual wood on the structure itself; is that correct?

A.  That's correct.

Q.  Okay.  There's no -- there's -- there's no separate contract with Tuttotondo, only -- only this purchase order; is that correct?

A.  From the documents that I have, that is correct.

Q.  When this says, "The purchase order is governed by and solely incorporates the standard terms and conditions of Carnival Cruise Line," I mean, that's -- like, what is that referring to?

A.  This is purchasing boilerplate documentation and language for every purchase order.

Q.  Does that include any type of, like, refund or return policy or grace period or anything like that?

A.  I don't know.

Q.  Okay.  I'll just -- for the record, I'm going to mark this as -- is for the -- all right.  I'll try and cast it.  All right.  Do you see this document titled purchase order terms and conditions?



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 38 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                                    38

A.  Yes, I do.

Q.  Okay.  Well, you must have seen this before at some point, right?

A.  It's not particularly familiar to me, no.

Q.  Well, I'll represent to you that I -- I went to this website, www.carnival.com/supplychain.  And this -- yeah, this -- basically I -- yeah, basically, I just typed in this address and this document came up. And that -- you don't -- I mean, you don't dispute that this -- this is the document that comes up through that link, right?

A.  I don't dispute that, no.

Q.  Okay.  And you don't dispute that this is a -- is a true and authentic copy of Carnival's purchase order terms and conditions that are applicable to -- to that purchase order that links to it, correct?

MR. JARNAGIN:  Objection.  Form.

THE WITNESS:  I don't -- I don't dispute that, no.

BY MR. HAYASHI:

Q.  Okay.  To your -- I mean, to your knowledge, the terms didn't -- didn't change in any substantive way between the time of Ms. Wampole's incident and today, did they?

A.  I don't know.



MR. HAYASHI:  Okay.  Well -- well, Mr. Jarnagin, this -- this -- Carnival is not -- not going to dispute the authenticity of this purchase order terms and conditions that are linked to the -- the document, are they?

MR. JARNAGIN:  I can't agree to it just because the purchase order is from 2017, and I don't know if those terms and conditions have been updated in the eight years since.  But I can agree that that is what comes up when you type it into the address field today.

MR. HAYASHI:  Well, because I want to be able to know if we can -- if we can rely on -- on this or -- or if not this, if Carnival can let us know if there's a -- if there's another version, and provided if there -- if there is.  Is that something you can -- you can look into if you're not -- if you can't agree to stipulating to -- to this document?

MR. JARNAGIN:  Yeah.  I mean, I -- I would have to make that request to Carnival and do the due diligence to see if there have been any changes since 2017.  Yeah.

BY MR. HAYASHI:

    Q.  Is it your testimony that Tuttotondo had final approval authority over -- over the design of this



Jacuzzi structure?

A.  I don't have any documents related to the approval of the design, so I only show that it's done by Tuttotondo.

Q.  Okay.  So sitting here today, we don't know who had final approval authority, Carnival or Tuttotondo, over this -- over the design of this Jacuzzi structure; is that correct?

A.  From the records that I have, that is correct.

Q.  And when you say that this was fabricated on the ship, I -- was it still -- do you know -- and I'm not saying Carnival had the plans or anything, but do you -- do you know if Tuttotondo used any type of -- type of, you know, common plan that might have been used as, like, a template across the other ships or if -- or if this was just custom built for this specific ship?

A.  I don't know.

Q.  Do you know if this hatch was designed to support the weight of an average adult passenger -- or maybe instead of average, I should say support the weight of a reasonable range of weights of adult passengers that were walking or standing on it?

A.  I don't know.

Q.  And this -- this Jacuzzi structure was made of



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 41 of 57

MICHAEL UPTON Corp. Rep.                                            July 30, 2025
WAMPOLE vs CARNIVAL                                                          41

teak wood, correct?

A.   From the photos, I see that that is teak wood on the deck.

Q.   Is there any other type of material that was -- that was used to compose it or just teak wood?

A.   I don't know.

Q.   Do you know what weight -- what weight load this hatch was designed to withstand before, you know, any type of structural compromising issues could arise?

A.   I don't know.

Q.   Were any type of third-party engineering or naval architecture firms consulted in regards to this Jacuzzi structure?

A.   I don't know.  From the records I have, I do not see anything related to that.

Q.   Were any type of defects, material weakness, or construction deviations documented after installation but before Ms. Wampole's incident?

A.   From the records I have, I don't see anything related to any of those items.

Q.   And when you say the documents you're looking at, I mean, just to be fair, you're looking at that purchase order, correct?

A.   That's correct.

Q.   Is -- is there any other document that you're



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 42 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                                   42

referring to when you say from the documents you see?

A.   That was the only document I was able to find related to this project.

Q.   Okay.  So to be fair, it's -- it's -- from the document you see, singular.  I -- you're probably used to saying documents, but you mean document, singular, correct?

A.   That's correct.

MR. JARNAGIN:  Objection.  Form.

BY MR. HAYASHI:

Q.   And you don't -- you've never seen and you don't know if Carnival has ever seen the blueprints or engineering plans for -- for the -- for this Jacuzzi structure?

A.   I don't know.

Q.   You don't -- you don't know if -- you don't know if anybody at Carnival ever saw the blueprints or engineering plans, correct?

MR. JARNAGIN:  Objection.

THE WITNESS:  That's correct.

MR. JARNAGIN:  Form.

BY MR. HAYASHI:

Q.   You said you don't know if this structure was inspected after it was fabricated by Carnival at any point?



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 43 of 57

MICHAEL UPTON Corp. Rep.                                     July 30, 2025
WAMPOLE vs CARNIVAL                                                    43

A.  I don't know.

Q.  Has any classification society reviewed, rejected, or flagged the area where Ms. Wampole's incident occurred?

A.  I don't know.

Q.  Do you know if any US Coast Guard SOLAS or internal Carnival safety standards apply to this Jacuzzi area?

A.  I don't know.

MR. JARNAGIN:  Yeah.  And let me just put an objection on the record, to the extent these questions were already asked of Ms. Porsege, we defer to Ms. Porsege's testimony.

MR. HAYASHI:  Yeah.  I may have asked about the classification society, but anyway.

BY MR. HAYASHI:

Q.  Did Carnival perform any in-house safety audits or engineering evaluations of this Jacuzzi area at any point prior to Ms. Wampole's incident?

A.  I don't know.

Q.  And you said since this was installed in 2017, the Jacuzzi structure, you don't know if it's been repaired, reinforced, replaced, or any type of work order was made for this, do you know?

A.  From the document and record that I have, I --



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 44 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                               44

I don't see anything related to -- to that.

MR. JARNAGIN:  I just need to repeat to the extent that Ms. Porsege addressed this in her testimony, we defer to her testimony.

MR. HAYASHI:  Right.

BY MR. HAYASHI:

Q.  Well, you're aware that there's -- there's at least -- I don't remember how many, but there's at least some -- some work orders for the Jacuzzi, right?

A.  I haven't seen any documents related to that.

Q.  Okay.  You said you don't have any specific knowledge about maintenance or any of that related to Ms. Wampole's incident just in general?

A.  That's correct.  As I was only briefed on design and installation.

Q.  And that -- that design and installation that you were briefed on, it -- it didn't include whether or not that support beam that we see, at least the -- the -- at least the one off to the side was in the original build or not.

A.  So there's -- there's no record of that being added.  So from the photos you showed, it was non existent, and then it was there.  So I -- I don't have any details as to why that was added.

Q.  If something like that is added, wouldn't some



type of document of some time -- type be produced, like a work order or -- or some type of -- wouldn't some type of document exist if some type of change like that was made?

A.  I don't know.

Q.  Were any complaints or observations recorded about movement, instability, or soft spots on this Jacuzzi structure?

A.  I don't have any detail related to -- to that, no.

Q.  In all the years you've been working for Carnival, have you ever heard of anybody else falling in a hatch of any type?

A.  No.  I -- I don't have any information of anyone falling through a hatch.

Q.  Okay.  Whether on a Jacuzzi structure or not, you don't -- you don't have any personal memory or corporate memory of anybody falling in a hatch?

A.  That is correct.

Q.  You don't know if there was any type of internal decision or meeting regarding this -- regarding the design of this Jacuzzi structure?

A.  I don't know.

Q.  And do you know if Carnival had any type of guidelines for -- for Tuttotondo to follow at all in



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 46 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                                   46

regards to this Jacuzzi structure?

A.   I don't know.

Q.   How about the Serenity area in general?  I mean, was -- was there any type of guidelines, like, you know, it has to have a certain vibe of some type or -- or anything?

A.   I don't know.

Q.   Does Carnival have any type of policies or standards regarding preventing collapses, you know, in the walking surfaces, not just hatches, but just in general?

A.   I don't know.

Q.   You don't know if any type of international maritime building codes or industry standards would have applied to this -- to this Jacuzzi structure, correct?

A.   That is correct.

Q.   Is it fair to say if this Jacuzzi structure had -- had the support beams that we see -- that we saw in that photograph that showed those two support beams, Ms. -- Ms. Wampole's incident probably would not have occurred?

A.   I don't know.

Q.   This is the first time you've ever heard of anything like this happening?



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 47 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                                    47

A.   That is correct.

Q.   What, if anything, has Carnival done to make sure that this doesn't happen again?

MR. JARNAGIN:  Objection.  Form.

THE WITNESS:  I don't know.

BY MR. HAYASHI:

Q.   You don't know if -- if the -- well, let me -- let me go back to this Exhibit 3.  This is Page 14, Figure 11, six photographs here.  I'll represent that is -- this is the area underneath the hatch, like, underneath the Jacuzzi structure.  Do you see this?

A.   Yes, I do.

Q.   Have you ever seen what it looked like underneath that Jacuzzi structure before?

A.   I have not.

Q.   Okay.  Is it your understanding, just from being responsible for maintenance, repairs in general, is -- is, you know -- is this how areas like this are supposed to look?

A.   I don't know, as -- as it's under -- under the guest-facing.

Q.   Okay.  So if there's -- there's a substantial amount of rust and rot, I don't know if that's -- that's okay for that to be there?

MR. JARNAGIN:  Objection.  Form.



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 48 of 57

MICHAEL UPTON Corp. Rep.                                July 30, 2025
WAMPOLE vs CARNIVAL                                               48

THE WITNESS:  I don't know.

BY MR. HAYASHI:

Q.  What, if anything, does Carnival do to make sure that rot or rust doesn't develop to a -- to a dangerous degree on its -- on its structures I, you know -- its passengers might use, such as the whirlpool, I mean, the Jacuzzi structure?

MR. JARNAGIN:  Objection.

THE WITNESS:  I don't know.

MR. JARNAGIN:  Form.

BY MR. HAYASHI:

Q.  I'm just curious, sir, what -- well, okay. Let me ask this -- it's Plaintiff's Exhibit 5.

THE VIDEOGRAPHER:  Counsel, I was going to ask you if before you get into this document, do you mind if we go off the record for a moment?

MR. HAYASHI:  Okay.

THE VIDEOGRAPHER:  Off the record.  Time is 11:14.

(A recess was taken.)

THE VIDEOGRAPHER:  Back on the record.  The time is 11:25.

MR. HAYASHI:  I'll show what I'm marking as Plaintiff's Exhibit 5.

(Plaintiff's Exhibit 5 was marked for



Case 1:24-cv-24361-KMM   Document 44-5   Entered on FLSD Docket 08/18/2025   Page 49 of 57

MICHAEL UPTON Corp. Rep.                                    July 30, 2025
WAMPOLE vs CARNIVAL                                              49

identification.)

BY MR. HAYASHI:

Q.  I don't suppose you've ever seen this photograph before?

A.  I have not seen this.

Q.  Okay.  But would this -- would Carnival ever put some type of wooden plank out to cover a hatch like this that collapses?

A.  I don't know.

Q.  I guess -- yeah.  Do you also see some -- some parts of the wood are darker than others.  Do you see, like, on the -- below the wood, the -- the plank and to the left of the plank?

Do you see there are -- there are certain tiles, I'll -- I'll call them tiles of certain wood -- wooden pieces that are a bit darker than the others. Do you see that?

A.  Yes, I do.

MR. JARNAGIN:  Objection.  Form.

BY MR. HAYASHI:

Q.  Is that -- do you know if that's a part of the aesthetic design of this -- of this structure or if -- or if that's because these might have been more wet, do you -- do you know one way or the other?

A.  I don't know.



Q.  You said you -- you said you -- you have no knowledge of -- of how frequently this Jacuzzi structure is supposed to be inspected to see if there's any maintenance necessary; is that correct?

A.  That is correct.

Q.  That goes for both the top and the bottom part?

A.  That's correct.

MR. HAYASHI:  I don't think I have any other questions, but I -- I'll -- I'll give you a call after this, okay, Mr. Jarnagin?

MR. JARNAGIN:  Okay.

And I don't have any questions for you, Mr. Upton.  I appreciate your appearance and your time today.

THE WITNESS:  Thank you all.

THE VIDEOGRAPHER:  Okay.  One moment, please. Counsel, read or waive?

MR. JARNAGIN:  He'll read.

THE VIDEOGRAPHER:  All right.  One moment, please.  This now concludes the videoconference deposition of corporate representative for Carnival Corporation, Michael Upton.

Counsel, transcript and video orders. Mr. Hayashi?



MR. HAYASHI:  The videos will be -- will be pretty much ready to be produced as soon as we let you know.  Like, it's not like you have to prepare it like the court reporter, right?

THE VIDEOGRAPHER:  Correct.  We'll have it on file.

MR. HAYASHI:  Okay.  Well, we'll let you know if we need it.  Thanks.

THE VIDEOGRAPHER:  Okay.  Do you need the transcript?

MR. HAYASHI:  All right.  If we're ordering, yeah.

THE VIDEOGRAPHER:  Okay.

MR. HAYASHI:  We'll order.

THE VIDEOGRAPHER:  All right.

And Mr. Jarnagin.

MR. JARNAGIN:  We'll take a copy.

THE VIDEOGRAPHER:  Transcript only?

MR. JARNAGIN:  Yes.

THE VIDEOGRAPHER:  Okay.  Thank you.  We are now going off the record on July 30th, 2025, at 11:29 a.m.  Eastern Time.

(The deposition concluded at 11:29 a.m.)



CERTIFICATE OF OATH


STATE OF FLORIDA

COUNTY OF MIAMI-DADE COUNTY


     I, the undersigned authority, certify that

MICHAEL UPTON personally appeared before me and was

duly sworn on Wednesday, July 30th, 2025.

     WITNESS my hand and official seal this

9th day of August 2025.

_____
Gustavo Carmenates
Notary Commission Florida/HH638896
Commission Expires: February 10, 2029


Type of Identification Produced: Driver's License



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

CERTIFICATE OF DIGITAL REPORTER


          I, Gustavo Carmenates, a Digital Reporter and

Notary Public within and for the State of Florida,

do hereby certify:


          That MICHAEL UPTON, the witness whose

examination is hereinbefore set forth, was first duly

sworn by me and that said testimony was accurately

captured with annotations by me during the proceeding.


          I further certify that I am not related to any

of the parties to this action by blood or marriage and

that I am in no way interested in the outcome of this

matter.


          IN WITNESS THEREOF, I have hereunto set my hand

this 9th day of August 2025.


          _____
          Gustavo Carmenates
          Notary Commission Florida/HH638896
          Commission Expires: February 10, 2029



CERTIFICATE OF TRANSCRIPTIONIST

I, Micah Hodgens, Legal Transcriptionist, do hereby certify:

That the foregoing is a complete and true transcription of the original digital audio recording of the testimony and proceedings captured in the above-entitled matter.  As the transcriptionist, I have reviewed and transcribed the entirety of the original digital audio recording of the proceeding to ensure a verbatim record to the best of my ability.

I further certify that I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 9th day of August 2025.



_____

Micah Hodgens

ESQUIRE
DEPOSITION SOLUTIONS

DEPOSITION ERRATA SHEET

Assignment No. J13247333

Case Caption: Darlene Wampole vs. Carnival Corporation

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 2025.

_____

MICHAEL UPTON



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____

MICHAEL UPTON



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

MICHAEL UPTON

