UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24-cv-24361-KMM

DARLENE WAMPOLE,

     Plaintiff,

v.

CARNIVAL CORPORATION,

     Defendant.

_____/

**PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S STATEMENT OF FACTS IN SUPPORT OF SUMMARY JUDGMENT[1]**

Plaintiff, DARLENE WAMPOLE, (hereinafter "WAMPOLE") by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 56(a), hereby responds to Defendant, CARNIVAL CORPORATION'S (hereinafter "CARNIVAL") Statement of Facts in Support of its Motion for Summary Judgment against. WAMPOLE states as follows:

**WAMPOLE'S Response to CARNIVAL'S Statement of "Facts"**

1. Undisputed unless other facts come to WAMPOLE and/or her counsel's attention.

2. Undisputed unless other facts come to WAMPOLE and/or her counsel's attention.

3. Disputed to the extent that CARNIVAL is claiming it had no involvement in the design of this hot tub and hatch at all. As explained further in Plaintiff's response to CARNIVAL's motion for summary judgment, [DE 44], CARNIVAL produced a purchase order in discovery that directs the builder (Tutto Tondo Solutions, LLC), to "Sand, prep, and primer **at rusted areas** as needed. White pain and Blue skirting to match as per CCL specifications." See Composite [DE 44-1 at p. 4].

4. Undisputed unless other facts come to WAMPOLE and/or her counsel's attention.

5. Undisputed unless other facts come to WAMPOLE and/or her counsel's attention.

6. Undisputed unless other facts come to WAMPOLE and/or her counsel's attention.

---

[1] This response is being supplemented pursuant to this Honorable Court's order permitting Plaintiff to supplement her briefing after the additional discovery. See [DE 57 at p. 3].

7. Undisputed unless other facts come to WAMPOLE and/or her counsel's attention. However, WAMPOLE disputes CARNIVAL's framing of the incident as less severe than it was.

8. Undisputed that no prior incidents or complaints were disclosed, disputed to the extent that prior incidents may have occurred but not have been reported to CARNIVAL.

9. Undisputed that no prior incidents or complaints were disclosed, disputed to the extent that prior incidents may have occurred but not have been reported to CARNIVAL.

10. Disputed. CARNIVAL's corporate representative testified that "**there might have been a leak of some sort that the whirlpool might have had**. I think those were the two work orders that were produced." See [DE 41-4 at 33:21-34:2 (emphasis added); see also [DE 44-2 at p. 2] (batestamp GR000116).

**WAMPOLE'S Additional Statement of Material Facts**

11. The area immediately underneath the wooden hatch was visibly rusted, degraded, and poorly maintained, as seen in the photographs taken below by WAMPOLE's expert engineer, Dr. Francisco De Caso, during his April 18, 2025 inspection of the Carnival Conquest during this litigation. Moreover, the hatch was missing a support beam at the time of WAMPOLE's incident. This combination of factors caused the hatch to collapse as WAMPOLE walked across it. See Report of WAMPOLE'S expert engineer, Dr. Francisco De Caso, [DE 44-1 at p. 14-23].

12. CARNIVAL's security officer watch report taken during its investigation of the incident states that "parts of wooden deck seemed to be soft and damage [sic] thereby area was cordoned/secured for safety reason." See [DE 44-3 at p. 6] (batestamp GR000006).

13. WAMPOLE has evidence that CARNIVAL not only approved of this dangerous area and hatch design, but actively participated in its design. During discovery, CARNIVAL produced the purchase order for the whirlpool with the hatch, which directs the builder (Tutto Tondo Solutions, LLC), to "Sand, prep, and primer at rusted areas as needed. White pain and Blue skirting to match as per CCL specifications." See [DE 44-4 at p. 4].

14. WAMPOLE asked whether the area being discussed was connected to the subject jacuzzi structure involved in the incident in any way, but the corporate representative did not know. See Deposition Transcript of Defendant's Design Corporate Representative, Michael Upton, [DE 44-5 at 23:15-18, 24:11-21].

15. WAMPOLE took photographs after her incident, attached hereto as [DE 44-6 and DE 44-7].

**WAMPOLE'S Supplemental Statement of Material Facts**

**2**
**ARONFELD TRIAL LAWYERS**
**Aronfeld.com**

16. On September 22, 2025, WAMPOLE took the deposition of CARNIVAL's facility maintenance manager, Yordan Petrov, acting as corporate representative for CARNIVAL.

17. Mr. Petrov testified as follows regarding the support beam:

> Q. Okay. Now, when were these -- like, were these original to the structure or were they added sometime later?
>
> A. No. We added one after the incident to reinforce the structure to avoid future incident.

See Exhibit 1 at 8:24-9:3.

18. Mr. Petrov testified initially that teak wood and steel never rusted, both of which were used on the subject hatch (the locking mechanism was made of steel). See Exhibit 1 at 17:17-23, 18:15-19:16.

19. However, when confronted with the photographs of the area below the hatch taken by Plaintiff's expert, Dr. Francisco De Caso, he changed his testimony as follows:

> Q. No, right. But I'm just saying that this shows that steel can rust, the -- the steel on the -- on the ship, correct?
>
> **A. Yes. Of course**, because -- and after you do the maintenance, if you see the rust.

See Exhibit 1 at 20:14-21:2.

20. Moreover, Mr. Petrov testified as follows:

> Q. Okay. Do you know when the last time before this woman had fallen through -- do you know when the last time before that, somebody went down here to – to make sure that things looked okay?
>
> MR. JARNAGIN: Objection. Form.
>
> THE WITNESS: No. I don't remember because there is -- **ask for the work orders if we have**. I don't remember.

See Exhibit 1 at 21:3-10 (emphasis added).

21. Mr. Petrov also testified as follows:

> Q. So -- so there -- there was some -- there was some rust back in 2021, and -- and Carnival made a work order to address it, right?
> . . .
> Q. Got it. But -- well, I mean, but this isn't in a totally different area from the -- from Jacuzzi. It's -- it's just -- it's just slightly, you know, I guess, to the above and

to the right.· I mean, it's -- it's still -- are you saying -- are you saying you wouldn't be able to -- let me -- let me scroll down here. Looking at the right middle -- middle right photograph of Page 12, this area looks all interconnected. It looks to me like if you were to go down the hatch that Ms. Wampole fell down, you would -- you would be able to see the pump.· I mean -- I mean, you probably be -- I mean, could you see the pump from there?

MR. JARNAGIN: Objection. Form.

THE WITNESS: I don't know. I don't remember that, because I -- I remember we were using the – the front hatch for the replacing the pump because it's more easy for us.· I -- I -- at least I remember like that, but now I'm not -- not sure. I need to be physically to see.

BY MR. HAYASHI:

Q.· Okay.· But bottom line -- bottom line, some -- a part of underneath this -- this, you know, wooden structure, had rust. I know it was the pump casing, but it was underneath this wooden structure and it had rust prior to Ms. Wampole's incident, correct?

MR. JARNAGIN: Objection.· Form.

THE WITNESS: No. The -- the rust was only in the casing on the pump.

See Exhibit 1 at 33:19-34:4, 39:19-40:22.

22. However, Mr. Petrov was incorrect, as Dr. De Caso found that the pump casing referred to was in the area underneath the hatch. Dr. De Caso's report states "a general view of the area below the raised whirlpool port deck is provided in Figure 7." See See [DE 44-1 at p. 9].



See [DE 44-1 at p. 12].

23. On September 22, 2025, WAMPOLE took the deposition of CARNIVAL's senior project

manager for new build and refurbishment, Alexis Sanchez, acting as corporate representative for CARNIVAL. See Exhibit 2 at 1:14-22.

24. Mr. Sanchez offered the following testimony regarding the purchase order that stated "Sand, prep, and primer at rusted areas as needed." [DE 44-4 at p. 4]:

> Q.· Okay. Well -- well, rust is something Carnival -- Carnival knew could have been present, which is why it -- it said sand, prep, and primer at rusted areas as needed. It, you know -- it – it knew -- it knew rust might be present, but you're just not sure if it actually was.
>
> A. Correct.

See Exhibit 2 at 27:21-28:2.

25. Mr. Sanchez also testified as follows regarding the approval of the design of the whirlpool area, which included the hatch:

> Q. Okay. Well, I mean, **presumably Carnival had somebody responsible for reviewing and approving these drawings**, even if the architect Carnival works with now might have been different, correct?
>
> **A. Typically, yes**.
>
> . . .
>
> Q. Okay. Does -- does Carnival have any type of input into, you know, how this -- how this Jacuzzi structure looks, or, you know, like -- like, basically, does -- does Carnival have any suggestions or anything during this build process, or does it just basically tell Tutto Tondo, just come up with whatever you want to come up with and -- and we'll -- I guess, we'll review it after that?
>
> A. So the designers or architects have a – what we call design development drawing or design intent. It's basically a sketch per se and like an -- a drawing that shows a Jacuzzi, an area, steps, you know, something like that. And then once we send that over with a contract, let's say, then the -- the company, or Tutto Tondo in this case, will develop a technical drawing or a detailed drawing. And that's what we see here. So we have a -- like a -- a design intent drawing or preliminary design.
>
> Q. That design –
>
> A. And then they develop it.
>
> Q. Okay. But that design intent drawing, that doesn't exist anymore because that basically gets converted into that architect drawing that we looked at?

A. Correct.

Q. Okay. Got it. **So then the very first design intent drawing, that is generated by Carnival internally and -- and sent to Tutto Tondo**; is that correct?

A. Yes.

Q. Okay. Do you know if those design intent drawings had the vertical -- I mean, sorry, not vertical. The top -- the top hatches, the ones that passengers would step on?

A. I don't.

Q. Okay. Is that just kind of lost to time at this point, 2017 and all?

A. I think so. Yeah. Obviously.

See Exhibit 2 at 32:8-12, 37:22-39:10 (emphasis added).

26. Mr. Sanchez also testified that the subject hatch was included in the design drawings CARNIVAL approved of. See Exhibit 2 at 16:9-16.

27. The design drawings are attached as Exhibit 3.

WHEREFORE, Plaintiff DARLENE WAMPOLE respectfully requests that this Honorable Court deny Defendant CARNIVAL CORPORATION'S motion in total, and to grant all other relief this Honorable Court deems just and appropriate.

<u>**CERTIFICATE OF SERVICE**</u>

We hereby certify that on October 10, 2025, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,
**ARONFELD TRIAL LAWYERS**
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
Tel:  (305) 441- 0440
Fax: (305) 441 - 0198
Attorneys for WAMPOLE

By:  */s/ Matthias M. Hayashi, Esq.*
Matthias M. Hayashi, Esq.

Florida Bar Number: 115973
mhayashi@aronfeld.com
Spencer Marc Aronfeld, Esq.
Florida Bar Number: 905161
aronfeld@aronfeld.com

**ARONFELD TRIAL LAWYERS**
**Aronfeld.com**