UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:24-cv-24361-KMM

DARLENE WAMPOLE,

     Plaintiff,

v.

CARNIVAL CORPORATION,

     Defendant.

_____/

### PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]

Plaintiff, DARLENE WAMPOLE (hereinafter referred to as "WAMPOLE"), by and through her undersigned counsel, and Fed. R. Civ. P. 56(a), responds to Defendant CARNIVAL CORPORATION's (hereinafter referred to as "Defendant") motion for summary judgment. In support of her response, WAMPOLE states as follows:

### I. INTRODUCTION

This is a maritime personal injury matter arising from an incident involving guest DARLENE WAMPOLE while she was a passenger aboard the Carnival *Conquest* on April 5, 2024. WAMPOLE alleges she sustained injuries while she was walking on a wooden deck next to a whirlpool on the starboard side when a wooden hatch beneath her collapsed. See photographs of WAMPOLE after her incident below:

**(Space Intentionally Blank, See Next Page)**

---

[1] This response is being supplemented pursuant to this Honorable Court's order permitting Plaintiff to supplement her briefing after the additional discovery. See [DE 57 at p. 3].



See [DE 44-6]; see also [DE 44-7].

The area immediately underneath the wooden hatch was visibly rusted, degraded, and poorly maintained, as seen in the photographs taken below by WAMPOLE's expert engineer, Dr. Francisco De Caso, during his April 18, 2025 inspection of the Carnival *Conquest* during this litigation. This degradation caused the hatch to be softened and weakened to the point where it could no longer support WAMPOLE's bodyweight as she walked over it.

Moreover, the hatch was missing a support beam at the time of WAMPOLE's incident, as seen in the photograph (bottom left) taken by WAMPOLE after her incident and by Dr. De Caso (bottom right) during the ship inspection.

**(Space Intentionally Blank, See Next Page)**



See Report of WAMPOLE'S expert engineer, Dr. Francisco De Caso, [DE 44-1 at p. 14].



Figure 14 – Comparison of manhole during incident (left) and during the inspection (right), showing missing aluminum cross-beam element at time of incident

See [DE 44-1 at p. 19].

Dr. De Caso explains in his report, an excerpt of which is attached below, that this combination of factors caused the hatch to collapse as WAMPOLE walked across it.

?? Save it with a quick document summary.

5.3     Moreover, this deck a
chemicals, and high ch
the whirlpool. Thus, hig
plates due to the highe

5.4     In fact, when comparing
it was apparent the su
compared to the replac
deck wood planks. Furt
the raised deck

See [DE 44-1 at p. 16].

Defendant moves for summary judgment claiming that there is no evidence of notice as to counts I-III, and no evidence of participation in and/or approval of design as to counts III-V. As discussed below, WAMPOLE has abundance evidence that creates a genuine issue of material fact on the issues of notice and design, and summary judgment is improper.

<u>**II. SUMMARY JUDGMENT STANDARD**</u>

Summary judgment is appropriate **only** when the pleadings, depositions, affidavits, and exhibits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 265 (1986). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Allen v. Tyson Foods, Inc.*, 121 F. 3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*

When evaluating a motion for summary judgment, a court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether the evidence could reasonably sustain a jury verdict for the nonmovant. *Celotex*, 477 U.S. at 322-23; *Tyson*, 121 F.3d at 646.

"[O]nce the moving party has met its burden of showing a basis for the motion, the nonmoving party is required to 'go beyond the pleadings' and present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00*, 391 F. App'x 791, 794 (11th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but [instead] must set forth specific facts showing that there is a genuine issue for trial." *See Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505 at 2510 (1986). "Likewise, a [nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." *Maddox Jones v. Bd. of Regents of Univ. of Ga.*, 2011 WL 5903518, at *2 (11th Cir. Nov. 22, 2011).

### III. THERE IS ABUNDANT EVIDENCE OF NOTICE AS TO COUNTS I-III

Defendant's relevant arguments boil down to the core contention that there is allegedly no evidence of notice. However, there is abundant evidence of notice, and therefore Defendant's motion for summary judgment should be denied.

a. *Actual and constructive notice based on Defendant's work orders, security officer watch report, and photographic/expert evidence.*

On January 9, 2022, the following work order was purportedly closed out:



See [DE 44-2 at p. 2] (batestamp GR000116).

In this regard, CARNIVAL's corporate representative testified that "**there might have been a leak of some sort that the whirlpool might have had**. I think those were the two work orders that were produced." See [DE 41-4 at 33:21-34:2 (emphasis added).

Work orders such as these are evidence of notice. As the court in *Selfridge v. Carnival* held:

> Defendant claims that Plaintiff misconstrues the significance of these orders, highlighting that they do not specifically report issues involving the door's hinges or its closing force or range. However, in the Court's view, a reasonably jury may find that Work Orders involving high priority noises coming from the door, as well as improper opening and closing of the door, are pertinent to the alleged malfunctioning of the door. **For instance, a reasonable jury may conclude that both the scrunch and improper closing of the door reported in these work orders were indeed related to issues with the door's hinges or damping mechanism and, as such, Defendant should have been aware of the alleged danger**.

*Selfridge v. Carnival Corp.*, No. 20-23308-CIV, 2022 WL 796378, at *7 (S.D. Fla. Mar. 16, 2022) (emphasis added) (citing *Rioux v. City of Atl.*, 520 F.3d 1269, 1274 (11th Cir. 2008).

**WAMPOLE respectfully submits that the logic of *Selfridge* applies to this case as well**, since just like in *Selfridge*, WAMPOLE expects that CARNIVAL will attempt to argue that this work orders were not related to the same issue WAMPOLE encountered. However, this is an issue of fact for the jury to determine, as a reasonable jury could find that the "whirlpool leaking from pump and rust casing" was related to the rusted, degraded, and poorly maintained whirlpool area involved in WAMPOLE'S case, which included the hatch that collapsed.

Furthermore, CARNIVAL's security officer watch report taken during its investigation of the incident states that "parts of wooden deck seemed to be soft and damage [sic] thereby area was cordoned/secured for safety reason."



See [DE 44-3 at p. 6] (batestamp GR000006).

While CARNIVAL will no doubt argue that this observation is only relevant to the post-incident collapsed condition of the hatch, the defective condition of the deck was specifically described as being "soft," which suggests the type of degradation Dr. De Caso observed underneath the hatch, which was due to lack of routine maintenance in an area that was wet, chlorinated, and subject to chemical contamination. Both this security officer's watch report and

the work order previously discussed are evidence that CARNIVAL knew or should have known that the whirlpool area, including the hatch, was not receiving the maintenance it needed, which could lead to foreseeable incidents such as the hatch's collapse.

In this regard, WAMPOLE notes that CARNIVAL's corporate representative admitted that CARNIVAL does not routinely inspect or maintain the area underneath the hatch, like it does the area above, which corroborates the photograph and expert evidence WAMPOLE has that the area was not adequately maintained. CARNIVAL's corporate representative testified as follows:

> Q. So for these daily inspections, is both the -- is only the surface like the part that you can see, the passengers can see inspected, or do they also inspect underneath the hatch?
> A. We wouldn't open the hatch or go underneath the hatch unless maintenance needs to do that for the jacuzzi.
> Q. Do you know how frequently the area underneath the hatch is inspected?
> A. **I don't believe that any inspections occur**. It is only accessed if we need to access the jacuzzi for a certain reason.

See [DE 41-4 at 38:8-19] (emphasis added).

Moreover, WAMPOLE respectfully submits that even aside from the security officer's watch report and the work order, the photographic and expert evidence she has that the area immediately underneath the hatch had become dangerously rusted and degraded is, itself, evidence of notice, since it shows that the area had not been maintained for a long period of time.

    *b.*       *Testimony of Facility Maintenance Manager Yordan Petrov.*

CARNIVAL's facility maintenance manager, Yordan Petrov, acting as corporate representative of CARNIVAL, also suggested that the last time the area underneath the hatch was inspected was when the work order was performed. See [DE 58-1 at 21:3-10].

Moreover, although Mr. Petrov testified that the rusted pump casing was not underneath the subject jacuzzi structure, 33:19-34:4, 39:19-40:22, Mr. Petrov was incorrect, as Dr. De Caso found that the pump casing referred to was in the area underneath the hatch. Dr. De Caso's report states "a general view of the area below the raised whirlpool port deck is provided in Figure 7." See See [DE 44-1 at p. 9].



Figure 7 – Area below raised deck on port side

See [DE 44-1 at p. 12].

His testimony also contradicts CARNIVAL's corporate represetntive, who testified that "**<u>there might have been a leak of some sort that the whirlpool might have had</u>**. I think those were the two work orders that were produced." See [DE 41-4 at 33:21-34:2 (emphasis added). It makes no sense how the leak in the whirlpool could have caused the rust unless the pump was undeath it. All of this shows that the area directly underneath was experiencing rusting and that CARNIVAL was aware of this, and this deterioration is one of the reasons WAMPOLE's expert found caused the incident. See [DE 44-1 at p. 16].

For all of these reasons, there are abundant genuine issues of material fact on the issue of notice, which precludes summary judgment against WAMPOLE.

*c. Industry Standards and Design*.

Here, industry standards provide evidence that Defendant should have known that the subject hatch was unreasonably dangerous without the support beam it lacked at the time of WAMPOLE's incident. *Holderbaum v. Carnival Corp*., 2015 WL 5006071, at *5 (S.D. Fla. Aug. 23, 2015); *see also Pustka v. Printpack Inc*., 168 F. App'x 583, 584 (5th Cir. 2006) (A defendant had more than a duty to simply promulgate policies and procedures, it had a duty to enforce them and to properly carry them out); *see also Lebron v. Royal Caribbean Cruises, Ltd*., No. 16-24687-CIV, 2018 WL 5113943, at *7 (S.D. Fla. Aug. 14, 2018), report and recommendation adopted sub nom. *Lebron v. Royal Carribean Cruises Ltd*., No. 16-24687-CIV, 2018 WL 5098870 (S.D. Fla. Aug. 28, 2018).

The law in the former fifth circuit, which is binding on courts in this district unless the eleventh circuit rules otherwise,[2] clearly establishes that industry standards, even ones that do not have the force of law, are sufficient by themselves to create a genuine issue of material fact on the issue of notice. As the court in *Holderbaum* eloquently summarized,

> "[t]he law in the Eleventh Circuit, as established by the former Fifth Circuit, is that advisory guidelines and recommendations, while not conclusive, are admissible as bearing on the standard of care in determining negligence." Cook, 2012 WL 1792628, at *3 (citing Muncie Aviation Corp., 519 F.2d 1178; Frazier, 568 F.2d 378); see also Giorgio, 2006 WL 1042003, at *2. Such guidelines are also probative of the defendant's constructive knowledge of the allegedly hazardous condition. See Cook, 2012 WL 1792628, at *3; Donlon, 2011 WL 6020574, at *6.
>
> . . .
>
> Based on the IMO recommendation and the record evidence, a reasonable jury could conclude that the handrail was too large, hazardous, and that Defendant knew it was too large and hazardous. See Muncie Aviation Corp., 519 F.2d at 1181 (holding that to the extent the defendant's pilot failed to consult advisory materials issued by the Federal Aviation Administration, or failed to follow their recommendations, "the jury could permissibly infer that he failed to meet the appropriate standard of due care"); Frazier, 568 F.2d at 381–82 (holding that the district court erroneously excluded testimony concerning violations of industry standards to establish the defendant's negligence); see also Donlon, 2011 WL 6020574, at *6 (denying summary judgment motion filed by houseboat manufacturer in lawsuit filed by person who fell down the stairs of a houseboat, holding that non-binding standards promulgated by the ASTM were admissible because a jury could use the evidence to conclude that the stairs "were defectively designed" and because the standards put defendant "on constructive notice of the potential danger of the stairs").

*Holderbaum v. Carnival Corp.*, 87 F. Supp. 3d 1345, 1356-57 (S.D. Fla. 2015) (emphasis added) (quoting *Cook v. Royal Caribbean Cruises*, Ltd., No. 11-20723-CIV, 2012 WL 1792628, at *3 (S.D. Fla. May 15, 2012) ("Defendant seeks to exclude the standards/guidelines at issue because they are not mandatory, do not have the force of law and are not always directly applicable to maritime conditions. But the law in the Eleventh Circuit, as established by the former Fifth Circuit, is that advisory guidelines and recommendations, while not conclusive, are admissible as

---

[2] "We hold that the decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

bearing on the standard of care in determining negligence.") (emphasis added); *see also Andersen v. Royal Caribbean Cruises Ltd.*, No. 19-CV-24639, 2021 WL 2414151, at *9 (S.D. Fla. June 14, 2021) (citing *Bunch v. Carnival Corp.*, 825 F. App'x 713, 715-16 (11th Cir. 2020)). **Notably, another court in this district ruled on virtually the same arguments WAMPOLE is presently making, and found that summary judgment was not appropriate**. *See Selfridge v. Carnival Corp.*, 2022 WL 796378, at *7 ("Finally, **the Court is unpersuaded by Defendant's claim that the cited industry standards and guidelines are irrelevant in this case because they may not always apply to cruise ships**—a proposition for which Defendant does not cite any authority. While this argument could hold water under a different fact pattern, here, "Plaintiff's allegations of negligence do not concern conditions unique to maritime travel.") (emphasis added).

Here, WAMPOLE's expert engineer, Dr. De Caso, offers the following opinions:

**(Space Intentionally Blank, See Next Page)**

**10**
**ARONFELD TRIAL LAWYERS**
**Aronfeld.com**

ick document summary.

See [DE 44-1 at p. 21].



See [DE 44-1 at p. 22].

**ARONFELD TRIAL LAWYERS**
**Aronfeld.com**

As such, WAMPOLE respectfully submits that this is additional evidence of notice that, taken together with the evidence WAMPOLE previously submitted, is without out a doubt sufficient to create a genuine issue of material fact as to notice. *See Andersen v. Royal Caribbean Cruises Ltd.*, No. 19-CV-24639, 2021 WL 2414151, at *9 (S.D. Fla. June 14, 2021); In sum, WAMPOLE respectfully submits that all of the above evidence and more "allows the inference that the cruise ship operator had 'actual or constructive knowledge . . . [of the danger of these risk creating conditions].'" *Frasca v. NCL (Bahamas), Ltd.*, 654 F. App'x 949, 954 (11th Cir. 2016) (quoting *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275 (11th Cir. 2015)). Therefore, there are an abundance of genuine issues of material fact, Defendant's motion should be denied.

## IV. THERE IS SUFFICIENT EVIDENCE OF CARNIVAL'S INVOLVEMENT IN THE DESIGN OF THE SUBJECT AREA

a. *Purchase Order*.

WAMPOLE has evidence that CARNIVAL not only approved of this dangerous area and hatch design, but actively participated in its design. During discovery, CARNIVAL produced the purchase order below:



See [DE 44-4 at p. 4].

Notably, this purchase order directs the builder (Tutto Tondo Solutions, LLC), to "Sand, prep, and primer **at rusted areas** as needed. White pain and Blue skirting to match as per CCL specifications." See Id. (emphasis added). CARNIVAL will undoubtedly claim that it is unclear from this purchase order if the area being discussed is the whirlpool area.

First, however, WAMPOLE asked whether the area being discussed was connected to the subject jacuzzi structure involved in the incident in any way, but the corporate representative did not know. See Deposition Transcript of Defendant's Design Corporate Representative, Michael Upton, [DE 44-5 at 23:15-18, 24:11-21]. WAMPOLE is separately moving to reopen discovery based on this corporate representative being unprepared to answer her questions.

Second, this purchase order shows that CARNIVAL participates in the design and approves of the design of these modifications it hired Tutto Tondo to install, and this creates a genuine issue of material fact on the issue of whether CARNIVAL participated in the design and/or approved of the design of the subject jacuzzi structure (including the subject hatch), since this evidence shows that, contrary to what it claims, CARNIVAL does participate in the design and/or approves of the design of the structures it hires Tutto Tondo to modify, it does not simply outsource all decision making to Tutto Tondo.

In this regard, contrary to CARNIVAL'S arguments, WAMPOLE does not need to present evidence that a cruise line directly participated in the design of the dangerous condition. All that is required is **evidence that a cruise line approved of a negligently designed condition**. *See Hoover v. NCL (Bahamas) Ltd*., No. 19-22906-CIV, 2020 WL 5834742 at *2 (S.D. Fla. Sept. 29, 2020) (finding that evidence of approval of the faulty design at issue was sufficient to establish a genuine issue of material fact in a negligent design/approval claim, even where there was no evidence of direct participation in the design itself); *see also Fylling v. Royal Caribbean Cruises, Ltd*., No. 18-CV-21953, 2019 WL 8275158, at *4 (S.D. Fla. Dec. 10, 2019); *see also Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583966 at *4 (S.D. Fla. Aug. 16, 2013).

Moreover, pursuant to *Yusko v. NCL (Bahamas), Ltd.*, 4 F.4th 1164, 1170 (11th Cir. 2021), this evidence is sufficient to establish vicarious liability on the part of CARNIVAL, and notice is not required in vicarious liability claims. See *Id.* ("In short, we hold that a passenger need not establish that a shipowner had actual or constructive notice of a risk-creating condition to hold a shipowner liable for the negligent acts of its employees. Consequently, the district court erred in

**14**
**ARONFELD TRIAL LAWYERS**
Aronfeld.com

granting summary judgment based on Yusko's inability to establish that NCL had actual or constructive notice of a risk-creating condition."); see also Order Denying Motion to Dismiss in *Goodenough v. Carnival*, [DE 45-1 at pp. 3-4] ("**Defendant insists Plaintiff must, and fails to, identify a specific tortfeasor. . . . Notwithstanding these arguments, Defendant concedes there appears to be "no binding case law requiring that level of specificity" for a vicarious negligent design claim**. (Id. 9 (citation omitted)) (emphasis added). The Court agrees with this concession — the undersigned sees no reason to require Defendant's suggested level of specificity.") (citing *Haggerty v. Carnival Corp.*, No. 24-cv-20367, 2024 WL 3415789, at *10 (S.D. Fla. June 25, 2024) (alterations added), report and recommendation adopted, No. 24-20367-Civ, 2024 WL 3411641 (S.D. Fla. July 15, 2024)); see also response to motion for summary judgment in *Goodenough v. Carnival*, [DE 45-2 at p. 1]; see also Order Denying Motion for Summary Judgment in *Goodenough v. Carnival*, [DE 45-3 at p. 1]; *see also Willis v. Royal Caribbean Cruises, Ltd.*, 77 F.4th 1332, 1339 (11th Cir. 2023) ("'[T]he notice requirement does not—and was never meant to—apply to maritime negligence claims proceeding under a theory of vicarious liability.'"); *see also Hunter v. Carnival Corp.*, 609 F. Supp. 3d 1305, 1310 (S.D. Fla. 2022).

 *b. Testimony of Senior Project Manager for New Build and Refurbishment, Alexis Sanchez.*

 CARNIVAL's senior project manager for new build and refurbishment, Alexis Sanchez, acting as corporate representative for CARNIVAL, offered the following testimony regarding the purchase order that stated "Sand, prep, and primer at rusted areas as needed." [DE 44-4 at p. 4]:

> Q.· Okay. Well -- well, rust is something Carnival -- Carnival knew could have been present, which is why it -- it said sand, prep, and primer at rusted areas as needed. It, you know -- it – it knew -- it knew rust might be present, but you're just not sure if it actually was.
>
> A. Correct.

See Exhibit 2 at 27:21-28:2.

 Mr. Sanchez also testified as follows regarding the approval of the design of the whirlpool area, which included the hatch:

> Q. Okay. Well, I mean, **presumably Carnival had somebody responsible for reviewing and approving these drawings**, even if the architect Carnival works with now might have been different, correct?

**A. Typically, yes**.

. . .

Q. Okay. Does -- does Carnival have any type of input into, you know, how this -- how this Jacuzzi structure looks, or, you know, like -- like, basically, does -- does Carnival have any suggestions or anything during this build process, or does it just basically tell Tutto Tondo, just come up with whatever you want to come up with and -- and we'll -- I guess, we'll review it after that?

A. So the designers or architects have a – what we call design development drawing or design intent. It's basically a sketch per se and like an -- a drawing that shows a Jacuzzi, an area, steps, you know, something like that. And then once we send that over with a contract, let's say, then the -- the company, or Tutto Tondo in this case, will develop a technical drawing or a detailed drawing. And that's what we see here. So we have a -- like a -- a design intent drawing or preliminary design.

Q. That design –

A. And then they develop it.

Q. Okay. But that design intent drawing, that doesn't exist anymore because that basically gets converted into that architect drawing that we looked at?

A. Correct.

Q. Okay. Got it. **So then the very first design intent drawing, that is generated by Carnival internally and -- and sent to Tutto Tondo**; is that correct?

A. Yes.

Q. Okay. Do you know if those design intent drawings had the vertical -- I mean, sorry, not vertical. The top -- the top hatches, the ones that passengers would step on?

A. I don't.

Q. Okay. Is that just kind of lost to time at this point, 2017 and all?

A. I think so. Yeah. Obviously.

See Exhibit 2 at 32:8-12, 37:22-39:10 (emphasis added).

Mr. Sanchez' testimony further shows that CARNIVAL, at the very least, approved of the design of the whirlpool area, including the hatch, regardless of whether the hatch was in the initial drawings CARNIVAL's architect made or not. Ultimately, the hatch, which did not include the support beam added later, was in the design drawings that CARNIVAL approved of. See [DE 58-2 at 16:9-16, 32:8-12, 37:22-39:10]; see also [DE 58-3]; see also [DE 58-1 at 8:24-9:3] (Mr. Petrov testified that "We added [the support beam] after the incident to reinforce the structure to avoid future incident.").

The evidence in this case is certainly sufficient to establish a genuine issue of material fact on the issue of negligent design, and CARNIVAL'S motion should be denied.

**WHEREFORE**, Plaintiff, DARLENE WAMPOLE, respectfully requests that this Honorable Court deny Defendant CARNIVAL CORPORATION's motion for summary judgment and grant all other relief this Honorable Court deems just and appropriate.

<u>**CERTIFICATE OF SERVICE**</u>

We hereby certify that on October 10, 2025, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF. We also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,
**ARONFELD TRIAL LAWYERS**
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
Tel:  (305) 441- 0440
Fax: (305) 441 - 0198
Attorneys for Plaintiff

By:     */s/ Matthias M. Hayashi, Esq.*
Matthias M. Hayashi, Esq.
Florida Bar Number: 115973
mhayashi@aronfeld.com
Spencer Marc Aronfeld, Esq.
Florida Bar Number: 905161
aronfeld@aronfeld.com